**BANK BRUSSELS LAMBERT, et al., Plaintiffs,**

v.

**CREDIT LYONNAIS (SUISSE), S.A., et al., Defendants.**

**Credit Lyonnais (Suisse) S.A., Third–Party Plaintiff,**

v.

**Rogers & Wells, a Partnership, et al., Third–Party Defendants.**

**No. 93 Civ. 6876(LMM)RLE.**

United States District Court, S.D. New York.

Sept. 20, 2002.

Robert L. Weigel, Gibson Dunn & Crutcher, New York City, for Bank Brussells Lambert.

William J. Schwartz, Kronish, Lieb, Weiner & Hellman, LLP, New York City, for Rogers & Wells, LLP.

Robert C. Clyne, Hill Rivkins & Hayden, LLP, New York City, for American Bureau of Shipping.

### OPINION & ORDER

ELLIS, United States Magistrate Judge.

### I. INTRODUCTION

Before this Court is a motion by third party plaintiff Credit Lyonnais Suisse

("CLS") pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure to compel third-party defendant Roger & Wells ("R & W") to produce certain documents prepared by R & W when it represented CLS in defending this action by various lenders to AroChem Corporation ("AroChem"). CLS seeks the production of documents related to internal conflicts reviews performed by R & W regarding R & W's potential liability for alleged malpractice, and R & W's potential conflicts with other R & W clients and prospective clients in light of R & W's ongoing representation of CLS. In the alternative, CLS seeks the identification of the AroChem-related clients addressed in the conflict documents. R & W claims that these documents are protected by the attorney-client privilege, and further, CLS is not entitled to the identification of the clients in the documents. For the following reasons, the Court finds that R & W's communication with in-house counsel is not protected by the attorney-client privilege.

## II. BACKGROUND

In May 1991, AroChem International Ltd. ("AIL") requested financing from CLS of certain transactions involving back-to-back contracts for the purchase and sale of oil in the United States. Memorandum of Law of Third–Party Plaintiff Credit Lyonnais (Suisse) S.A. in Support of Motion to Compel Production of Documents from Third–Party Defendant Rogers & Wells and For Other Relief ("Pl. Mem.") at 3. At that time, CLS retained R & W to advise it on the proposed financings and to document the financings in order to properly perfect CLS's first priority security interest. *Id.* CLS financed AIL pursuant to R & W's advice from May through August 1991, when CLS terminated its relationship with AIL. *Id.* In October 1993, Bank Brussels Lambert, Swiss Bank Corporation, Banque Indosuez, and Skopbank (hereinafter, "the RCA Banks")

commenced litigation ("the underlying litigation") against CLS alleging that it had violated RICO and intentionally committed fraud, conversion, and other common law torts when it financed the contracts assigned to AIL by AroChem. Memorandum of Law of Third–Party Defendant Rogers & Wells in Opposition to the Motion by Credit Lyonnais (Suisse) S.A. to Compel the Production of Privileged Documents (Def.Mem.) at 2–3. R & W defended CLS in the underlying litigation until December 1994. Pl. Mem. at 2–3.

In or around September 1993, Kikka Harrison ("Harrison"), a CLS vice president, met with Donald F. Luke and Peter Williams, two R & W partners, to discuss the underlying litigation. Def. Mem. at 4. During this meeting, Harrison stated that if CLS were found liable to the RCA Banks, R & W would be liable to CLS. *Id.* Harrison's statement was brought to the attention of Richard A. Cirrillo ("Cirrillo"), the chair of R & W's Clients and Ethics Committee, who determined that R & W needed to perform an internal review of its 1991 representation of CLS. *Id.*

The internal review process generated a variety of materials, including a series of handwritten interview notes and memoranda and other communications from Cirrillo containing legal advice. *Id.* at 5. In addition, Cirrillo responded to queries by members of the CLS litigation team as to how they should conduct themselves vis-a-vis CLS during the pendency of the internal review. In addition to the internal review, R & W also performed a conflicts check with respect to the other parties in the litigation when R & W was asked to represent CLS in the underlying litigation. *Id.* at 5. Further, during the course of R & W's representation of CLS, R & W also performed conflicts checks regarding prospective clients. *Id.* at 5–6. In November 1993, R & W asked that Indosuez, an RCA lender, waive a conflict of interest and

consent to R & W's representation of CLS in the underlying litigation. Affidavit of Peter C. Harrar in Support of Motion of Third Party Plaintiff Credit Lyonnais (Suisse) S.A. to Compel Production of Documents From Third Party Defendant Rogers & Wells and for Other Relief ¶ 38.

On July 7, 1995, CLS filed a third-party complaint against R & W alleging: (1) malpractice and breach of contract on its advice about the AIL financings in 1991; and (2) breach of fiduciary duty, fraud and breach of contract in connection with its defense of this action during the period from October 1, 1993 until CLS terminated R & W's representation in December 1994. Pl. Mem. at 2–4. CLS alleges that during this latter period, R & W concealed from CLS its own malpractice in 1991, and concealed from CLS the extent and significance of its representation or attempted representation of other parties contemporaneously adverse to CLS. *Id.* at 4.

CLS sought discovery about R & W's conflicts of interest, both in continuing to represent CLS despite its alleged malpractice, and R & W's attempted or actual representation of other AroChem-related entities. The only discovery that R & W produced on the conflicts issues, other than conflicts memos, new matter forms and correspondence concerning efforts to obtain conflict waivers, are two privilege logs. *Id.* at 4–5. The privilege logs describe the subject matter of the withheld documents as "internal review of representation issues." *Id.* at 5; Affidavit of Peter C. Harrar in Support of Motion of Third–Party Plaintiff Credit Lyonnais (Suisse) S.A. to Compel Production of Documents from Third–Party Defendant Rogers & Wells and For Other Relief at ¶ 47. R & W provided CLS a breakdown of those documents into two categories: (1) review of its own liability; and (2) review of its representation of other AroChem-related entities. *Id.* These documents are the subject of this motion to compel. CLS argues that the documents sought were collected in violation of its fiduciary duty to CLS, and therefore CLS is entitled to a review of the documents. R & W maintains that its internal conflict check is protected by the attorney-client privilege.

## III. DISCUSSION

### A. Production of Documents

■ Although it is unnecessary at this point in the litigation to decide whether or not R & W had an actual conflict of interest in representing CLS, it is important to note a few things about the ethical responsibilities of attorneys in the State of New York. Attorney conduct in New York is governed by the Code of Professional Responsibility Disciplinary Rules. The provisions regarding conflicts of interest are found in DR 5–105.[1] The conflict of inter-

---

1. New York's disciplinary rules provide in relevant part that:

    (a) A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under subdivision (c) of this section.

    (b) A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under subdivision (c) of this section.

    (c) In the situations covered by subdivisions (a) and (b) of this section, a lawyer may represent multiple clients if a disinterested lawyer would believe that the lawyer can competently represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved. 22 N.Y.C.R.R. § 1200.24(a), (b), (c).

est rules "preserve[s] the client's expectation of loyalty [and] promote[s] public confidence in the integrity of the Bar." *Tekni-Plex, Inc. v. Meyner & Landis,* 89 N.Y.2d 123, 131, 651 N.Y.S.2d 954, 674 N.E.2d 663 (N.Y.1996). They are also essential to "ensur[e] that attorneys remain faithful to the fiduciary duties of loyalty and confidentiality owed by attorneys to their clients." *Kassis v. Teacher's Insurance and Annuity Association,* 93 N.Y.2d 611, 616, 695 N.Y.S.2d 515, 717 N.E.2d 674 (N.Y.1999). The fiduciary duties of an attorney owed to a client are very serious. As Justice Cardozo once observed, "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (N.Y.1928). Therefore, while R & W was still in the employ of CLS, it was still obligated to maintain a fiduciary duty to CLS, even in performing its internal conflict review.

Turning to R & W's privilege claims, the attorney-client privilege is perhaps the oldest recognized common law privilege sanctioned by the courts. The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 393, 101 S.Ct. 677 (1981). However, because the privilege "stands in derogation of the public's 'right to every man's evidence, ... it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2d Cir.2000) (citation omitted). Accordingly, the privilege will only attach "(1) [w]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by

himself or the legal advisor, (8) except the protection be waived[.]" *United States v. Int'l Broth. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997)(*quoting In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036 (2d Cir.1984)).

The privilege was designed to protect the individual client. However, it has also been granted to corporations when consulting in-house counsel on legal matters. *See generally, Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970). In cases involving corporations and in-house counsel, courts have maintained a stricter standard for determining whether to protect confidential information through the attorney-client privilege. The stricter standards are the result of suspicion that "because they are employees of their client, and their livelihood depends on that single corporate client, in-house counsel are not as independent as outside counsel." Janet J. Higley, Robert C. Jones, Peter C. Buck, *Confidentiality of Communications by In-House Counsel for Financial Institutions,* 6 N.C.Banking Inst. 265, 280 (2002). There is also a concern that in-house attorneys are more likely to mix legal and business functions. *Id.* Only recently, however, have courts begun to struggle with the question of the attorney-client privilege being applied to in-house counsel communications within a law firm.

In raising the attorney-client privilege to protect its conflict check, R & W assumes that the privilege will automatically apply to in-house legal consultation. However, this assumption glosses over the general reluctance and narrow, grudging application of the privilege in these cases. The novel idea which R & W puts fourth first appeared in *In re Sunrise Securities Litigation,* 130 F.R.D. 560 (E.D.Pa.1989). In *Sunrise,* the Court initially refused to recognize the privilege for law firms consulting in-house counsel for lack of legal

precedent. *Id.* at 572. However, on reconsideration, the Court, although still recognizing no legal precedent for this application of the privilege, noted "that it is *possible* in *some* instances" for the privilege to apply. *Id.* at 595 (emphasis added). The Court then went on to find that the privilege did not apply in that case because the in-house consultation created a conflict of interest. The Court stated that, "when a law firm seeks legal advice from its in house counsel, the law firm's representation of itself (through in house counsel) might be directly adverse to, or materially limit, the law firm's representation of another client, thus creating a prohibited conflict of interest." *Id.* The Court went on to hold that a "law firm's communication with in-house counsel is not protected by the attorney client privilege if the communication *implicates* or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communication." *Id.* at 597 (emphasis added).

R & W cites a number of cases subsequent to *Sunrise* where the privilege was held applicable to in-house consultations by law firms. *See United States v. Rowe,* 96 F.3d 1294 (9th Cir.1996); *Hertzog, Calamari & Gleason v. Prudential Insurance Company of America,* 850 F.Supp. 255 (S.D.N.Y.1994); *Lama Holding Co. v. Shearman & Sterling,* 1991 WL 115052 (S.D.N.Y.1991). However, while these cases did recognize the attorney-client privilege for intra-firm communications, none of these cases addressed whether the privilege can be asserted against the firm's current client. See *Rowe,* 96 F.3d at 1296 (privilege asserted in response to governmental subpoena in criminal investigation); *Hertzog,* 850 F.Supp. at 255 (privilege applicable to communications during litigation where in-house counsel represented firm in said litigation); *Lama Holding,* 1991 WL 115052 at *1 (documents were privileged because Shearman & Sterling

was no longer employed by the plaintiffs). Asserting the privilege against a current client seems to create an inherent conflict against that client.

■ Under the New York Code of Professional Responsibility Disciplinary Rules, an attorney "must avoid not only the fact, but even the *appearance,* of representing conflicting interests." *Tekni–Plex,* 89 N.Y.2d at 130, 651 N.Y.S.2d 954, 674 N.E.2d 663 (*quoting Cardinale v. Golinello,* 43 N.Y.2d 288, 296, 401 N.Y.S.2d 191, 372 N.E.2d 26 (N.Y.1977))(emphasis added). To avoid the conflict or appearance thereof, the lawyer must get the consent of the clients to continue to represent them "after full disclosure of the implications of the simultaneous representation and the advantages and risks involved." DR 5–105(c). When R & W performed the conflict check, CLS was still its client. Therefore, R & W was under an ethical duty to disclose to CLS the results of its internal conflict check, and in no position to claim a privilege against their client. While the privilege will be applicable as against all the world, it cannot be maintained against CLS.

R & W has taken the untenable position that "[t]he advice [sought in performing its conflict check] was not sought for the benefit of CLS." Def. Mem. at 6. However, the purpose of the conflict review, as previously discussed, is to maintain the fiduciary duties of loyalty and confidentiality owed to the client. *See Kassis,* 93 N.Y.2d at 616, 695 N.Y.S.2d 515, 717 N.E.2d 674. Further, the Disciplinary Rules mandate an objective test prong to the consent requirement. To satisfy this prong, the question is "what a disinterested lawyer would believe." *Shaikh v. Waiters,* 185 Misc.2d 52, 56, 710 N.Y.S.2d 873 (Sup.Ct. Nassau County, 2000). It would seem inadvisable to expect in-house counsel to be shielded from a client's inquiries by attor-

ney-client privilege in performing a conflict check when it is common knowledge that a conflict as to one attorney at a firm is a conflict as to all. *See Kassis*, 93 N.Y.2d at 616, 695 N.Y.S.2d 515, 717 N.E.2d 674. Thus, this would appear to violate the objective attorney prong. Further, as the Court found in *Nesse v. Pittman*, 202 F.R.D. 344, 354 (D.D.C.2001), "permitting lawyers to rely on [attorney-client] privileges although they know or ought to know that they are in a perilous ethical position and in need of truly independent advice discourages them from seeking that advice."

Contrary to R & W's arguments, R & W can still perform its responsibilities under the Code of Professional Responsibility—it just is not protected by the attorney-client privilege. Therefore, this Court finds that a law firm cannot invoke the attorney-client privilege against a current client when performing a conflict check in furtherance of representing that client. Thus, R & W must produce documents related to its "internal review of representation" of CLS.

## B. Identity of Clients

Even if the internal review documents were protected by the attorney-client privilege, CLS may still discover the identities of the specific AroChem related clients addressed in the privilege log. CLS has asserts that, even if the internal review documents are confidential, names and identities of clients have never been held confidential. In the alternative, CLS argues that R & W waived any privilege since it has already revealed client identities in other documents such as R & W's conflicts check memoranda, internal new matter forms, and correspondence concerning its various efforts to obtain client waivers on its conflicting representations. Pl. Mem. at 13–14. R & W maintains that the privilege extends to the names on the privilege log, and further, that it has com-

plied with rules in maintaining its log. Further, R & W contends that revealing information in non-privileged documents in no way waives the same information in privileged documents.

■ It is well-established in the Second Circuit that a client's identity is not protected by the attorney-client privilege. *Gerald B. Lefcourt, P.C. v. United States*, 125 F.3d 79, 86 (2d Cir.1997) (*citing In re Grand Jury Subpoena Served Upon John Doe, Esq.*, 781 F.2d 238, 247 (2d Cir.1986) (*in banc*)); *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504–05 (2d Cir. 1991). An attorney may claim privilege regarding a client's identity only if there are "special circumstances." *Goldberger*, 935 F.2d at 505. While the Court has never indicated under what special circumstances identity may be privileged, it has ruled that even in circumstances where revealing the identity of a client may possibly or even likely incriminate that client, there is no privilege. *Lefcourt*, 125 F.3d at 86. R & W has not alleged any dire need to extend the protection of privilege to the names of their clients on the privilege log.

R & W has argued that its privilege log meets with the standards set fourth in Local Civil Rule 26.2(a)(2)(A)(ii). This rule reads, in part, that the privilege log must indicate the general subject matter of the document. R & W claims that the identity of the clients has nothing to do with the subject matter, and is simply CLS' "back-door attempt" to get to the substance of the documents. However, this Court finds that because the names of clients are not protected by privilege, and because the identity of the clients does go to the general subject matter of the documents, CLS is entitled to receive an updated privilege log which includes the names of the clients. The names of the clients in no way reveals

the substance of the documents, which would be the particulars of the conflict.

## IV. CONCLUSION

For the foregoing reasons, the CLS' motion to compel production of R & W's internal review documents is **GRANTED**.