BANK BRUSSELS LAMBERT, et al., Plaintiffs,

v.

CREDIT LYONNAIS (SUISSE), S.A., et al., Defendants.

Credit Lyonnais (Suisse) S.A., Third–Party Plaintiff,

v.

Rogers & Wells, a Partnership, et al., Third–Party Defendants.

No. 93 Civ. 6876(LMM)(RLE).

United States District Court, S.D. New York.

Oct. 23, 2002.

Robert L. Weigel, Gibson, Dunn & Crutcher, New york City, for Bank Brussels Lambert.

Helen Davis Chaitman, Phillips, Nizer, LLP, New York City, for Credit Lyonnais (Suisse), SA.

William J. Schwartz, Kronish, Lieb, Weiner & Hellman, LLP, New York City, for Rogers & Wells, LLP.

## OPINION & ORDER

ELLIS, United States Magistrate Judge.

## I. INTRODUCTION

Before this Court is a motion by third-party defendant Roger & Wells ("R & W") pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure to compel third-party plaintiff Credit Lyonnais Suisse ("CLS") to produce certain documents prepared by CLS's in-house counsel and outside counsel when R & W represented CLS in defending this action by various lenders to AroChem Corporation ("AroChem"). CLS claims that these documents are protected by the attorney-client privilege and are entitled to work product protection. For the following reasons, the Court finds that CLS has waived both the attorney-client privilege and work product protection by placing these documents "at issue."

## II. BACKGROUND

The facts of this action have been set forth in *Bank Brussels Lambert, et al. v. Credit Lyonnais (Suisse), et al.*, 220 F.Supp.2d 283 (S.D.N.Y.2002). Briefly summarized, in May 1991, AroChem International Ltd. ("AIL") requested financing from CLS of certain transactions involving back-to-back contracts for the purchase and sale of oil in the United States. Memorandum of Law of Third–Party Defendant Rogers & Wells' Motion to Compel the Production of Documents ("Def.Mem.") at 2. At that time, CLS retained R & W to advise it on the proposed financings and to document the financings in order to properly perfect CLS's first priority security interest. *Id.* In October 1993, Bank Brussels Lambert, Swiss Bank Corporation, Banque Indosuez, and Skopbank (hereinafter, "the RCA Banks") commenced litigation ("the underlying litigation") against CLS alleging that it had violated RICO and intentionally committed fraud, conversion, and other common law torts when it financed the

contracts assigned to AIL by AroChem. *Id.* After consulting with and being advised by its in-house counsel, CLS retained R & W to act as lead counsel in the underlying litigation. *Id.* R & W defended CLS in the underlying litigation until December 1994. Memorandum of Law of Credit Lyonnais (Suisse) S.A. in Opposition to Rogers & Wells' Motion to Compel the Production of Documents ("Pl. Mem.") at 2.

While R & W was defending CLS in the underlying litigation, CLS also consulted with other counsel, including its in-house counsel, in-house counsel at its parent company, and the Swiss firm of Lachenal Brechbühl, Cottier & Roguet (the "Cottier firm"). *Id.* at 3. In May, 1994, CLS also hired Kevin MacCarthy & Associates (the "MacCarthy firm") to work with R & W. *Id.* CLS would generate documents regarding the underlying litigation, and then distill the information to R & W through its in-house counsel and the Cottier firm. *Id.* at 11. CLS also instructed R & W to communicate with it through its other attorneys throughout the underlying litigation. Def. Mem. at 4. R & W did so until the MacCarthy firm was engaged as liaison counsel to R & W to provide "another voice in connection with the representation of [CLS] in the AroChem matter." *Id.*

On July 7, 1995, CLS filed a third-party complaint against R & W alleging: (1) malpractice and breach of contract on its advice about the AIL financings in 1991; and (2) breach of fiduciary duty, fraud, and breach of contract in connection with its defense of this action during the period from October 1, 1993, until CLS terminated R & W's representation in December 1994. *Id.* at 5. CLS alleges that during this latter period, R & W concealed from CLS its own malpractice in 1991, and concealed from CLS the extent and significance of its representation or attempted representation of other parties contemporaneously adverse to CLS. *Id.* CLS has alleged that during the underlying litigation, R & W interviewed Kikka Harrison, an account officer of CLS, and manipulated the interview to protect its own interests. *Id.*

R & W seeks certain documents exchanged between CLS and its various counsel both while CLS considered the AroChem financing and during the underlying litigation. R & W claims that these documents will aid in its defense, prove it did not defraud CLS and prove CLS's state of mind during the crucial events of the underlying litigation. CLS claims that its case against R & W is not so broad as to encompass any of the documents on its privilege log. CLS claims that its state of mind is of little consequence to its claims against R & W.

### III. DISCUSSION

#### A. Attorney–Client Privilege and Work Product Immunity

The attorney-client privilege is a legal doctrine that is often litigated and little understood. The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). However, because the privilege "stands in derogation of the public's 'right to every man's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000) (citation omitted). Accordingly, the privilege will only attach "(1) [w]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal advisor, (8) except the protection be waived[.]" *United States v. International Brotherhood of Teamsters*, 119 F.3d 210, 214 (2d Cir.1997)(*quoting In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir.1984)). Under the Federal Rules of Evidence 501, when parties are litigating state law claims, the state law defines the elements of attorney-client privilege. Therefore, under New York law, the party invoking the privilege "must demonstrate that the information at issue was a communication between client and counsel or his employee,

that it was intended to be and was in fact kept confidential, and that it was made in order to assist in obtaining or providing legal advice or services to the client." *Bowne of New York City, Inc. v. AmBase Corporation,* 150 F.R.D. 465, 470–71 (S.D.N.Y.1993).

■■■ Unlike the invocation of the attorney-client privilege, work product immunity is governed by federal law. *Id.* Federal Rules of Civil Procedure 26(b)(3) provides for a qualified immunity from discovery for documents "prepared in anticipation of litigation or for trial." Generally, courts find that work product immunity "applies only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation." *Martin v. Valley National Bank,* 140 F.R.D. 291, 304 (S.D.N.Y.1991). However, "if a party prepares a document in the ordinary course of business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." *Id.* Like the attorney-client privilege, the party invoking work product immunity bears the burden of proof. *See Bowne,* 150 F.R.D. at 472.

■■■ While affidavits are typically the preferred means of proving either privilege, courts can look to "an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps." *Id.* at 474. Privilege logs should "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the documents is at least potentially protected from disclosure." *Id.* However, even when a privilege log is supplied, it must "provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege." *Id.* If the log does not meet this standard, the privilege should be rejected. *Id.* As an initial matter, CLS's privilege log as a whole comes dangerously close to not meeting this standard. Some of the individual descriptions fall woefully short of detailing why these document are covered by either the attorney-client privilege or the work product immunity that CLS claims. For example, document number 38 on CLS' privilege log dated May 24, 2002, is listed as an "[i]nternal memo enclos-ing and discussing summary of AIL transactions." Also, number 85 on that same list describes a "fax letter inquiring re:CL affiliates." There is nothing in these descriptions which meets the standard of proof for making an initial determination of whether or not the documents are truly protected by some privilege. Also, "[a]lthough the work-product rule is invoked, we are not informed whether the notes were prepared in anticipation of litigation or for any other reason ... [and] ... we have virtually no clue as to the basis for the claim of work-product protection." *Id.* at 475. Nevertheless, for the following reasons, in spite of CLS's insufficient privilege log, I find most of these documents are not protected by privilege.

**B. "At Issue" Waiver**

R & W maintains that CLS cannot claim privilege over any communications involving the underlying litigation or the present litigation because, by bringing a claim of fraud and malpractice against R & W, CLS has placed these very documents at issue. R & W reasons that by allowing both in-house and outside counsel to filter its communications with R & W, CLS has placed communication with these entities "at issue." CLS, however, asserts that neither its malpractice claim nor its breach of fiduciary duty claim requires them to turn over any of the documents on its privilege log.

■■■ In this circuit, "the [attorney-client] privilege may implicitly be waived when [a party] asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991). The leading case on this policy, which has become known as the "at issue" waiver doctrine is *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975). The court in *Hearn* articulated a three prong test which must be met to find that a document has been placed "at issue": "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would

have denied the opposing party to information vital to his defense." 68 F.R.D. at 581.

The limits of the *Hearn* doctrine have been the source of much contention, but courts have generally applied the *Hearn* doctrine liberally, finding a broad waiver of attorney-client privilege where a party asserts a position "the truth of which can only be assessed by examination of the privileged communication." *Johnson Matthey, Inc. v. Research Corp.,* 2002 WL 1728566 at *3 (S.D.N.Y.2002) (*citing In re Kidder Peabody Secs. Litig.,* 168 F.R.D. 459, 470 (S.D.N.Y.1996)); *but see Rhone–Poulenc Rorer Inc. v. Home Indemnity Company,* 32 F.3d 851 (3d Cir.1994). Under this standard, a party does not have to expressly state that it relied on any advice from his attorney. *See, e.g., Pereira v. United Jersey Bank,* 1997 WL 773716 *4 (S.D.N.Y.1997); *Bowne,* 150 F.R.D. at 488. Indeed, it has already been observed in the underlying litigation that "[c]ases where courts have found a waiver of privilege based on the 'at issue' doctrine exhibit several common factors: (1) the very subject of privileged communications is critically relevant to the issue to be litigated, (2) there is a good faith basis for believing such essential privileged communications exist, and (3) there is no other source of direct proof on the issue." *Bank Brussels Lambert, et al. v. Credit Lyonnais (Suisse), et al.,* 1995 WL 598971 *5 (S.D.N.Y.1995) (citations omitted). Relying on these principles to guide this Court's decision, I now turn to this case.

▬ This Court has already decided that CLS placed R & W's advice both as "transactional" counsel and as "litigation" counsel "at-issue" by asserting a reliance on counsel defense. *Bank Brussels Lambert, et al. v. Credit Lyonnais (Suisse), et al.,* 1998 WL 567862 *1 (S.D.N.Y.1998). Therefore, regardless of how CLS tries to frame its claims against R & W, CLS's ability to prevail in this case will turn on whether or not their losses in the underlying litigation are related to reliance on R & W. The heart of this matter is to establish the relationship between CLS and R & W. To that end, CLS's arguments against compelling disclosure work to its disadvantage. In its memorandum of law, CLS argues that its relationship

with R & W and its other attorneys should be visualized as "concentric circles, with CLS in the center, in-house counsel in the inner ring, the Cottier firm in a middle ring, R & W in an outer ring and the adverse parties in the *BBL* case on the outside." Pl. Mem. at 11. CLS argues that information emanating from the center ring flows to the outside world. *Id.* However, the negative implication of this statement is that information from R & W flows to CLS along the same path. So information communicated both to CLS from R & W and to R & W from CLS was filtered through two levels. Thus, not only does CLS's reliance on R & W become "at issue," but also any communications between the parties, whether filtered or not. Further, CLS's arguments indicate a reliance on both in-house counsel and the Cottier firm in interpreting R & W information and strategy. Therefore, the documents on CLS's privilege log are "at issue" in this case.

Courts have recognized the importance of determining the extent to which outside attorneys influence and motivate a client's decision making process and knowledge. As one court has observed, "[a]ny relevant advice the defendants received from their own lawyer or other persons ... bears on the issue of their reasonable reliance." *In re Gaming Lottery Securities Litigation,* 2000 WL 340897 *2 (S.D.N.Y.2000). Since CLS claims that its problems in the underlying litigation are caused by the actions (or inactions) of R & W, "the legal advice [it] received from any other lawyers on that subject relates to the reasonableness of [its] reliance and is not subject to the attorney/client privilege." *Id.* Furthermore, if in-house counsel were acting as a filter, as CLS acknowledges, their "in-house counsel played a major role in shaping and informing [its] knowledge and intent." *Pereira,* 1997 WL 773716 at *5. The question of whether or not R & W mislead or misrepresented things to CLS thus directly depends on what CLS's other counsel knew. *See In re Buspirone Patent Litigation,* 210 F.R.D. 43 (S.D.N.Y.2002). Although CLS tries to gloss over what it has put at issue, there is no doubt that CLS's state of mind is relevant to this case, and therefore has put the otherwise privileged documents at issue. *See In re Gaming Lottery,* 2000 WL 340897 at *2;

*but see Tribune Co. v. Purcigliotti,* 1997 WL 10924 \*7 (S.D.N.Y.1997) (noting that, "[w]hile it may be true that plaintiffs must demonstrate reasonable reliance on the purported misrepresentations of defendants, and that they acted reasonably ... they can clearly do so without relying on privileged documents or communications with their attorneys.").

New York State courts have also recognized a broad interpretation of "at issue" waiver. The state courts have consistently held that where "an individual affirmatively places the underlying conduct at issue by bringing a civil suit, the courts have consistently held that the statutory protection is waived." *Green v. Montgomery,* 95 N.Y.2d 693, 701, 723 N.Y.S.2d 744, 746 N.E.2d 1036 (2001). Furthermore, in malpractice actions against a law firm, where its representation of the client overlaps and is simultaneous to another firm's representation of that client in the same matter, New York courts have found the client's communications with the non-defendant law firm to lose its privilege as to the defendant law firm. *See IMO Industries, Inc. v. Anderson Kill & Olick, P.C.,* 192 Misc.2d 605, 746 N.Y.S.2d 572, 577 (Sup. N.Y., N.Y. County 2002). Some courts have interpreted *Jakobleff v. Cerrato, Sweeney and Cohn,* 97 A.D.2d 834, 468 N.Y.S.2d 895 (2d Dept.1983), to severely limit "at issue" waivers of attorney-client privilege. However, in that case, the court would not allow the privilege to be waived against plaintiff's "present attorney" and not an attorney who concurrently represented the plaintiffs with the defendants. *Id.* The statutory attorney-client privilege is waived when a plaintiff places its communications "at issue" by asserting a reliance on counsel/fraud and misrepresentation claim against former counsel defendants. Thus, CLS has waived attorney-client privilege with regard to all documents on its privilege log.

## C. "At Issue" Waiver and the Work Product Doctrine

 Although CLS has not argued it, it is important to note that the "at issue" waiver doctrine applies to information protected by the work product privilege as well. *See Tribune,* 1997 WL 10924 at \*6–7. Further-

more, even if that "at issue" doctrine is to be applied exclusively to the attorney-client privilege, Rule 26(b)(3) of the Federal Rules of Civil Procedure is substantially similar to the "at issue" waiver standards. Therefore, for the reasoning in relation to "at issue" waiver of the attorney-client privilege, this Court finds that CLS has also waived its privilege with respect to all documents on the privilege log identified under by the "WP" indicator. However, the same reasoning does not completely apply with respect to those documents labeled with a "WPRW" indicator. By oral order of this Court on March 21, 2000, CLS was to identify by affidavit roughly when it first contemplated litigation against R & W to determine which documents were truly covered by work product protection. However, to date, CLS has not done this to my satisfaction and insists on using a sliding scale to determine work product protection. As I indicated previously, I am loath to do this. Thus I am left with no alternative but to conclude that the earliest date CLS can claim work product protection for documents against R & W is the date of termination, December 19, 1994, and any document on CLS' privilege log marked "WPRW" dated prior to December 19, 1994, is deemed to have waived work product protection against R & W for the foregoing reasons. Therefore, all documents labeled attorney-client, "WP," and/or "WPRW" dated prior to December 19, 1994, must be produced to R & W. However, all documents labeled "WPRW" and dated subsequent to December 19, 1994 are protected by work product immunity and do not have to be turned over to R & W.

## IV. CONCLUSION

For the foregoing reasons, R & W's motion to compel production of CLS' documents on its privilege log is **GRANTED IN PART, DENIED IN PART.**