**GRINNELL CORP. and Tyco Int'l (US) Inc., Plaintiffs,**

v.

**ITT CORP. and ITT Industries, Inc., Defendants.**

**No. 98 Civ. 4676(GEL).**

United States District Court, S.D. New York.

April 8, 2003.

John H. Kazanjian, Beveridge & Diamond, P.C., New York City, for plaintiffs Grinnell Corp. and Tyco International (US) Inc.

Peter A. Cross, Jacob, Medinger & Finnegan, LLP, New York City, for defendants ITT Industries, Inc.

Paul R. Koepff and Barry H. Goldstein, O'Melveny & Myers LLP, New York City, for non-party Pacific Employers Insurance Company.

## OPINION AND ORDER

LYNCH, District Judge.

In this prolonged litigation, plaintiff Tyco International, Inc. ("Tyco"), the corporate parent of plaintiff Grinnell Corporation, seeks indemnification pursuant to the asset purchase agreement governing its acquisition of Grinnell from Grinnell's former parent, defendant ITT Corporation ("ITT"), for expenses arising from numerous asbestos personal-injury lawsuits filed against Grinnell. In the present discovery dispute Tyco seeks to compel ITT and its insurer, Pacific Employers Insurance Company ("PEIC") to produce 27 documents withheld on grounds of the attorney-client and/or attorney work product privileges. All of the documents were created by James Moher, a California attorney who was "retained" by PEIC (P. Mem. at 3), before this lawsuit began, to investigate the underlying personal-injury claims that had been filed against Grinnell (the "asbestos lawsuits"). ITT claims both attorney-client and work product privileges for eight letters and a faxed draft of a letter sent by Moher to ITT and/or its insurer (the "correspondence"); PEIC asserts the privilege for four of these. The remaining 18 documents (the "internal documents") are memoranda Moher produced for his own use, for which ITT claims the work-product privilege.

Tyco argues that the attorney-client privilege does not apply to the correspondence because Moher was hired not as an attorney, but as a claims investigator, in order to conduct a "routine" factual inquiry to see "whether the asbestos personal injury claims fell within the terms of the indemnification provisions of the [asset-sale a]greement." (P. Mem. 1, 15.) Tyco further argues that none of the documents are protected by the work product privilege because they were not created in anticipation of litigation. ITT and PEIC deny these contentions, and have provided the court with the documents in question for in camera review.[1]

Because the correspondence, based upon ITT and PEIC's privilege logs and examina-

tion of the documents themselves, is clearly of a "legal character" providing "legal advice or services," Tyco's request to compel its production will be denied. *Spectrum Systems Int'l Corp. v. Chemical Bank*, 78 N.Y.2d 371, 378, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991). It is therefore unnecessary to consider whether the correspondence is protected by the work product privilege. With respect to the internal documents, Tyco's request to compel will be denied, because the documents appear to have been prepared in anticipation of possible litigation, and plaintiffs have not demonstrated a substantial need for the materials.

### I. Attorney–Client Privilege

In federal diversity actions such as this one, issues of attorney-client privilege are governed by New York law. Fed. R. Ev. 501; *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 508 (S.D.N.Y.2002). Under New York law, the attorney-client privilege protects "confidential communication[s] made between the attorney or his employee and the client in the course of professional employment." C.P.L.R. § 4503(a)(1). The party asserting the privilege bears the burden of establishing its elements. *Weber v. Paduano*, Dkt. No. 02 Civ. 3392(GEL), 2003 WL 161340, at *10 (S.D.N.Y. January 22, 2003) (citing *Arkwright Mutual Ins. Co. v. National Union Fire Ins.*, Dkt. No. 90 Civ. 7811(AGS), 1994 WL 510043, at *4 (S.D.N.Y. Sept. 16, 1994)). When the communication at issue originated with the attorney rather than the client, the party opposing production must establish that the communication was made "for the purpose of facilitating the rendition of legal advice or services," and that it is "predominantly of a legal character," consisting of more than facts known to third parties. *Spectrum Systems*, 78 N.Y.2d at 377–78, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (internal quotation and citation omitted).

ITT has established that, whatever the circumstances of Moher's initial retention by ITT and PEIC, this correspondence is privileged. The descriptions of the letters in

---

1. Several documents were provided to Tyco in redacted form; the Court has been provided with both the redacted and unredacted versions of those documents for in camera review.

ITT's log state either that they contained "analysis" of the underlying asbestos lawsuits or of Tyco's claims against ITT, or that they discussed "ITT's position" regarding indemnification. In camera review of the letters confirms the accuracy of these descriptions, and that the "analysis" involved was legal in nature. These letters are clearly legal communications between an attorney and his client. Therefore, Tyco's motion to compel will be denied as to the correspondence.

## II. *Work Product Privilege*

■ ITT has withheld the eighteen internal documents solely on basis of the work product privilege. While state law generally provides the rules of decision for questions of privilege in diversity actions, "federal law governs the applicability of the work product doctrine in all actions in federal court." *Weber*, 2003 WL 161340, at *3 (quoting *Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Services, Inc.*, Dkt. No. 96 Civ. 5590(MJL)(HBP), 1998 WL 729735, at *4 (S.D.N.Y. Oct. 16, 1998)).

## A. *Eligibility for the Privilege*

■ For documents to be protected as work product, the party opposing production must show that they were "prepared in anticipation of litigation or for trial." Fed. R.Civ.P. 26(b)(3). The Second Circuit has held that "documents should be deemed prepared 'in anticipation of litigation' ... if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'" *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir.1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994)). Thus, documents that were "prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not protected by the work product doctrine. *Id.*

■ The fact that Moher was retained by ITT's insurer, ostensibly to investigate claims pursuant to a third-party insurance policy, obscures rather than clarifies application of work product doctrine with respect to the products of his investigation. The dispute over ITT's and its insurer's potential liability here hinges not simply, as in the usual insurance case, on the nature and outcome of the underlying personal-injury lawsuits and the insurer's obligations under its insurance contract with the insured, but turns principally on the scope of the indemnification clause in the asset-sale agreement governing Tyco's acquisition of Grinnell from ITT. Tyco correctly argues (P. Mem. at 10–11) that a third-party insurer's investigation of a legal claim against its insured is generally considered to be part of "the ordinary course of business," and therefore not subject to work product protection, since "the very nature" of that business is "anticipating litigation." *Weber*, 2003 WL 161340, at *4. But the asbestos lawsuits here were not filed directly against the insured, ITT. Rather, they were filed against Grinnell, and ITT can be held responsible *only* by virtue of the asset-sale agreement with Tyco – an agreement that emphatically does *not* establish an insurer-insured relationship. Indeed, the applicability of the indemnity clause of that agreement to the asbestos lawsuits is at the heart of this litigation, and the parties do not dispute that Moher's investigation was largely concerned with that question.

Thus, it is hardly the case that, as argued by Grinnell (P. Mem. at 10–11), PEIC's investigation of ITT's indemnity obligation should be "presumed" to have been part of its "ordinary course of business," as would have been, say, an investigation by Grinnell's insurer of the facts underlying the asbestos lawsuits themselves. Framing the issue in terms of whether or not there was an "identifiable resolve [by ITT or PEIC] to litigate" the indemnity obligation (P. Reply at 5, quoting *Weber*, 2003 WL 161340, at *6) is inappropriate, since that is the standard for determining when "an insurance company's activity shifts from the ordinary course of business to anticipation of litigation." *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 422–23 (S.D.N.Y.1981). This case is quite different from those addressing the specific problem of work product created in the course of routine insurance investiga-

tions. Accordingly, the Court turns to the more general framework for determining work product protection established by the Second Circuit in *Adlman,* and simply examines whether the evidence demonstrates that the documents in question were prepared because of the prospect of litigation.

Many of the facts presented in the parties' briefs are not very helpful in determining whether or not documents created by Moher as part of his investigation were created "because of the prospect of litigation" over ITT's contractual indemnity obligation. The fact that Moher's investigation ended prior to the filing of this lawsuit (Lombardi Tr., P. Mem. Ex. A, at 331–32) is irrelevant both as a matter of law, *Adlman,* 134 F.3d at 1200 (work product privilege can apply even to documents created before the events giving rise to the litigation), and as a factual matter, since there is evidence that Moher's involvement ended only because Tyco chose to file this action in New York, and not because he was hired only to perform a routine insurance investigation rather than to prepare for litigation. (Lombardi Tr. 331–32) The motivation for hiring Moher and the particular circumstances when he was hired in or before 1996 (P. Mem. at 11) are also of limited relevance, since the documents at issue here were created in 1997 or 1998.

Tyco attempts to rule out the possibility that ITT anticipated litigation at the time the internal documents were created by pointing to deposition testimony by Irwin A. Bobrin, a PEIC representative, that "[w]e didn't know [in June 1998] that a suit would automatically follow. I mean, I guess we expected it, kind of, but that's something we had to see, whether it would happen or not." (Bobrin Tr., P. Mem. Ex. B., at 99.) This does not establish that ITT did not anticipate this litigation; to the contrary, it establishes that ITT viewed it as a very real possibility, albeit not "automatically" certain. Moreover, some of the privileged documents indicate that ITT was considering the possibility of denying the indemnification claims, and thus necessarily anticipating possible litigation, as early as November 1997.

■ Even if ITT and/or PEIC anticipated this litigation at the time each document was created, however, ITT must still bear the "burden of demonstrating that the documents would not have been prepared but for the litigation." *Weber,* 2003 WL 161340, at *7. That burden must be satisfied for each document individually on the basis of its privilege log entries, affidavits, and/or the documents themselves. *See, e.g., CSC Recovery Corp. v. Daido Steel Co., Ltd.,* Dkt. No. 94 Civ. 9214(LAP)(THK), 1997 WL 661122, at *2 (S.D.N.Y. Oct. 22, 1997), and cases cited therein.

Four of the internal documents—39, 50, 51, and 63—clearly constitute protected work product. ITT's description of document 39 in the privilege log states that it contains "ITT's position re: indemnification." Document 50 is described as "Note re: analysis of the Asset Purchase Agreement." Document 51 is described as "[r]esearch from attorney's working file." Document 63 consists of "Notes re: analysis of Liabilities Undertaking of Asset Purchase Agreement." These descriptions support an inference that ITT anticipated it might challenge its obligation to indemnify Tyco with respect to some or all of the California asbestos cases, and therefore can be fairly be said to have been created because of the prospect of litigation. The Court's review of the documents themselves confirms the accuracy of these descriptions, and the applicability of work product protection to them.

■ The case is closer with respect to the remaining fourteen items. ITT has failed to provide evidence that "substantially the same" documents would not have been prepared if ITT were simply planning on indemnifying Tyco without dispute. Moreover, the descriptions in ITT's privilege log do not on their face indicate that the documents reveal Moher's mental impressions or ITT's litigation strategy. Document 42 is described in ITT's privilege log as a "Memo re: documents reviewed at Grinnell's San Francisco's attorneys' offices." Document 46 is described as a "Memo re: conversation with David Herrod [counsel for Tyco] and defense of asbestos cases." Documents 53, 54, 56–61, and 64–66 are described as "reports" or "notes" on individual asbestos lawsuits. Document 55 has already been provided in re-

dacted form to Tyco; it is a "Preliminary Fact Sheet" in one of the asbestos cases with some handwritten notations on the first page of the Sheet redacted. In camera review of the documents and the redacted notes reveals that (with the exception of document 46, which consists of Moher's account of a phone conversation with Tyco's counsel regarding Tyco's sharing of information about the asbestos lawsuits with ITT), the documents at issue consist exclusively of facts regarding the asbestos lawsuits – facts, indeed, that ITT obtained from Grinnell's files. Factual information about the asbestos lawsuits, and discussion of how that information should be shared, would have been generated whether or not ITT planned on challenging Tyco's demand for indemnification.

At the same time, however, precisely because the documents reflect the attorney's notes of information taken from Grinnell's files, or of conversations with Grinnell's attorneys, the Court must be cautious in considering what those notes may reveal. The facts contained in Moher's notes are, by definition, already known to Tyco and Grinnell. Thus, the only new information that plaintiffs would gain from disclosure would be knowledge of what portions of the files a lawyer working for ITT chose to record. Under these circumstances, and given the likelihood that the purpose of Moher's investigations had by this time shifted to preparing for possible litigation over this issue, the material should be considered work product.

### B.  *Substantial Need and Undue Hardship*

The work product privilege is a qualified one; materials subject to it must be produced upon "a showing that the party seeking discovery has substantial need of the materials in the preparation of [its] case and ... is unable without undue hardship to obtain the substantial equivalent ... by other means." Fed.R.Civ.P. 26(b)(3). Tyco claims that it has substantial need for the withheld documents "to the extent that [they] identify products in any of the underlying asbestos cases" that were sold by Grinnell's Manufacturing and Supply Division before 1986. (P. Mem. at 13–14.) In camera inspection of the documents reveals that they contain no such information. As noted above, four of the documents contain principally legal analysis of the indemnification issue, and the remainder contain notes taken from files to which the plaintiffs already have access. Therefore, Tyco has not demonstrated a substantial need for any information contained in the documents in question. Accordingly, the motion to compel production of the work product documents will be denied.

### CONCLUSION

For the reasons stated above, Tyco's motion to compel is denied.

SO ORDERED.