[35 NYS3d 31]

Keith Stock, Respondent, v Schnader Harrison Segal & Lewis LLP et al., Appellants.

First Department, June 30, 2016

**APPEARANCES OF COUNSEL**

*Patterson Belknap Webb & Tyler LLP*, New York City (*Frederick B. Warder III* and *Jesse A. Townsend* of counsel), for appellants.

*The Roth Law Firm, PLLC*, New York City (*Jordan M. Kam* of counsel), for respondent.

*Stone Bonner & Rocco LLP*, New York City (*Ralph M. Stone* of counsel), *Amar D. Sarwal*, of the District of Columbia bar, admitted pro hac vice, and *Wendy E. Ackerman*, of the District of Columbia bar, admitted pro hac vice, of counsel, for Association of Corporate Counsel, amicus curiae.

*Willkie Farr & Gallagher LLP*, New York City (*Francis J. Menton, Jr.* of counsel), *David Polk & Wardwell LLP*, New York City (*Paul Spagnoletti* of counsel), *Morrison & Foerster LLP*, New York City (*James M. Bergin* of counsel), *Pillsbury Winthrop Shaw Pittman LLP*, New York City (*David G. Keyko* of counsel), and *Weil, Gotshal & Manges LLP*, New York City (*Irwin H. Warren* of counsel), for Willkie Farr & Gallagher LLP and others, amici curiae.

**OPINION OF THE COURT**

Friedman, J.

The primary issue on this appeal is whether attorneys who have sought the advice of their law firm's in-house general counsel on their ethical obligations in representing a firm client may successfully invoke attorney-client privilege to resist the client's demand for the disclosure of communications seeking or giving such advice. We hold that such communications are not subject to disclosure to the client under the fiduciary exception to the attorney-client privilege (recognized in *Hoopes v Carota*, 142 AD2d 906 [3d Dept 1988], *affd* 74 NY2d 716 [1989]) because, for purposes of the in-firm consultation on the ethical issue, the attorneys seeking the general counsel's advice, as well as the firm itself, were the general counsel's " 'real clients' " (*United States v Jicarilla Apache Nation*, 564 US 162, 172 [2011] [*Apache Nation*], quoting *Riggs Natl. Bank of Washington, D.C. v Zimmer*, 355 A2d 709, 711-712 [Del Ch 1976]). Further, we decline to adopt the "current client exception," under which a number of courts of other jurisdictions (*see e.g. Bank Brussels Lambert v Credit Lyonnais [Suisse]*, 220 F Supp 2d 283 [SD NY 2002]) have held a former client entitled to disclosure by a law firm of any in-firm communications relating to the client that took place while the firm was represent-

ing that client. Because we also find unavailing the former client's remaining arguments for compelling the law firm and one of its attorneys to disclose the in-firm attorney-client communications in question, we reverse the order appealed from and deny the motion to compel.

In 2008, the defendant law firm, Schnader Harrison Segal & Lewis LLP (SHS&L), through the managing partner of its New York City office, defendant M. Christine Carty, Esq., represented plaintiff Keith Stock in the negotiation of his separation agreement from his former employer, MasterCard International. Unbeknownst to plaintiff during the negotiation of the separation agreement, his termination by MasterCard triggered the acceleration of the ending dates of the exercise periods of certain stock options granted to him under Master-Card's Long-Term Incentive Plan (LTIP). Specifically, the termination of plaintiff's employment caused the exercise periods of his vested stock options under the LTIP to shrink from 10 years to between 90 and 120 days. Although SHS&L negotiated a delay of the date of plaintiff's termination for the purpose of allowing additional stock options to vest, the firm did not negotiate an extension of the truncated exercise periods of the vested options.

In January 2009, plaintiff learned from Morgan Stanley Smith Barney (MSSB), the administrator of the MasterCard LTIP, that all of his vested stock options, which allegedly had been worth more than $5 million in aggregate, had already expired under the terms of the LTIP as a result of the termination of his employment. Plaintiff thereupon consulted with SHS&L concerning possible remedies for this loss. Plaintiff, represented by SHS&L, subsequently commenced a lawsuit in federal court against MasterCard and an arbitration proceeding before the Financial Industry Regulatory Authority (FINRA) against MSSB. The SHS&L attorneys who represented plaintiff in these litigations were Theodore Hecht, Esq., and Cynthia Murray, Esq.[1]

On January 8, 2011, 11 days before the hearing of plaintiff's arbitral proceeding against MSSB was scheduled to begin, MSSB's counsel gave notice that it intended to call Carty to

---

1. It appears that Carty, the SHS&L partner who had advised plaintiff on the negotiation of his separation agreement with MasterCard, did not represent or advise him in connection with the arbitration against MSSB or the federal court action against MasterCard. As described below, however, Carty involuntarily became involved in the arbitration in a different capacity.

testify as a fact witness at the arbitration.[2] This development prompted Carty, Hecht and Murray to seek legal advice from SHS&L's in-house general counsel, Wilbur Kipnes, Esq.[3] The subject on which Carty, Hecht and Murray sought Kipnes's advice was their and the firm's ethical obligations, in light of MSSB's demand for Carty's testimony, under the lawyer-as-witness rule (see Rules of Professional Conduct [22 NYCRR 1200.0] [RPC] rule 3.7).[4] Kipnes never worked on any matter for plaintiff, and plaintiff was not billed for any of the time he devoted to the consultations with Carty and Hecht.

The FINRA arbitral hearing opened on January 19, 2011. Carty, who had been prepared by Murray for her appearance, testified on April 4, 2011. On April 5, 2011, the parties delivered their closing arguments to the arbitrators. Later that month, the arbitral tribunal issued an award denying all of plaintiff's claims against MSSB. Around the same time, most of plaintiff's claims in the federal court action against MasterCard were dismissed, and the case subsequently settled.

In April 2013, plaintiff commenced this action against SHS&L and Carty in Supreme Court, New York County.

---

**2.** In the same email stating their intention to call Carty as a witness, MSSB's counsel alerted SHS&L that MSSB would be taking the position in the arbitration "that your firm's failures respecting the contract negotiations, specifically here re: the option exercise window (particularly as pains were taken to extend the window to vest more options) are central to your client's woes."

**3.** At their depositions in this action, Carty and Hecht testified about the general subject matter of their consultation with Kipnes. Plaintiff agreed on the record not to treat this testimony as a waiver of attorney-client privilege.

**4.** RPC rule 3.7 ("Lawyer as witness") provides in pertinent part:

"(a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless [one or more of five exceptions, none of which is relevant here, applies.] . . .

"(b) A lawyer may not act as advocate before a tribunal in a matter if:

"(1) another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client; or

"(2) the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9."

RPC rule 1.7 prohibits a lawyer's undertaking the representation of a client whose interests conflict with those of another current client or with the lawyer's own interests, absent each affected client's informed consent given in writing. RPC rule 1.9 prohibits a representation that might prejudice the interests of a former client, absent the former client's informed consent given in writing.

Plaintiff alleges that SHS&L and Carty committed malpractice when they counseled him in connection with the termination of his employment by MasterCard in that they failed to advise him that his termination would accelerate the expiration of his vested stock options under the LTIP. Plaintiff also asserts claims against SHS&L and Carty for breach of fiduciary duty and violation of Judiciary Law § 487 by allegedly "attempt[ing] to cover up" the alleged malpractice and "[b]y trying to blame MasterCard and MSSB for their own mistakes." The merits of plaintiff's claims against SHS&L and Carty are not at issue on this appeal.

In response to plaintiff's disclosure demands in this action, SHS&L and Carty served a privilege log that listed about two dozen emails that had been exchanged among Kipnes, Carty, Hecht and Murray between January 10 and January 18, 2011 (the January 2011 emails) in connection with the consultation with Kipnes prompted by MSSB's statement of its intention to call Carty as a witness at the arbitration. Plaintiff made an application to the court for an order compelling SHS&L and Carty to produce the January 2011 emails. By order entered December 8, 2014, the court granted the application and directed SHS&L and Carty to produce the documents on the privilege log (2014 NY Slip Op 33171[U] [2014]). In so doing, the court appears to have relied on the fiduciary exception to attorney-client privilege recognized in *Hoopes v Carota* (142 AD2d 906 [3d Dept 1988], *supra*). The court also relied on its view that the record showed that Carty, one of the parties to the January 2011 emails, had not expected the communications with Kipnes to be held confidential as against plaintiff, who was then SHS&L's client. Finally, the court found that SHS&L had waived any privilege that would otherwise have attached to the documents by placing their contents at issue and by selectively disclosing communications among its attorneys. This appeal ensued.

The attorney-client privilege, "the oldest of the privileges for confidential communications known to the common law" (*Upjohn Co. v United States*, 449 US 383, 389 [1981]), exists for the purpose of "encourag[ing] full and frank communication between attorneys and their clients[,] . . . thereby promot[ing] broader public interests in the observance of law and administration of justice" (*id.*). New York has codified the attorney-client privilege at CPLR 4503, which provides in pertinent part:

"(a) 1. Confidential communication privileged. Unless the client waives the privilege, an attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing."

Nothing in CPLR 4503 suggests that consultations between a law firm, as client, and its in-house counsel, as attorney, are not covered by the privilege. In the corporate context, the Court of Appeals has recognized that the attorney-client privilege applies to communications between a corporation's employees and the corporation's in-house counsel for the purpose of providing legal advice to the corporation (*see Rossi v Blue Cross & Blue Shield of Greater N.Y.*, 73 NY2d 588, 591-592 [1989]). It has been recognized that lawyers associated in a firm have the same right to confide in their firm's in-house counsel (*see United States v Rowe*, 96 F3d 1294, 1296 [9th Cir 1996] [conversations between law firm's senior partner and junior attorneys who acted as the firm's in-house counsel were privileged]; *accord Hertzog, Calamari & Gleason v Prudential Ins. Co. of Am.*, 850 F Supp 255 [SD NY 1994]). In an action for legal malpractice, this principle has been applied to protect from disclosure records of consultations between the defendant law firm's attorneys and its in-house counsel concerning the firm's work for the plaintiff, where the consultations apparently occurred after the firm's representation of the plaintiff had ended (*see Lama Holding Co. v Shearman & Sterling*, 1991 WL 115052, 1991 US Dist LEXIS 7987 [SD NY, June 17, 1991, No. 89-Civ-3639 (KTD)]).

Plaintiff does not take issue with the right of SHS&L and Carty to invoke attorney-client privilege with respect to the January 2011 emails as against the rest of the world. Plaintiff contends, however, that these documents cannot be withheld from him, on the ground that the communications in question took place while the firm was still representing him and related to that representation. Plaintiff's primary reliance in seeking to obtain the January 2011 emails is on a doctrine known as the fiduciary exception to the attorney-client privilege.

Disagreeing with plaintiff and Supreme Court, we find that the fiduciary exception does not apply to the January 2011 emails.

The fiduciary exception to the attorney-client privilege has been described by the United States Supreme Court as follows:

> "English courts first developed the fiduciary exception as a principle of trust law in the 19th century. The rule was that when a trustee obtained legal advice to guide the administration of the trust, and not for the trustee's own defense in litigation, the beneficiaries were entitled to the production of documents related to that advice. The courts reasoned that the normal attorney-client privilege did not apply in this situation because the legal advice was sought for the beneficiaries' benefit and was obtained at the beneficiaries' expense by using trust funds to pay the attorney's fees.

> "The fiduciary exception quickly became an established feature of English common law, but it did not appear in this country until the following century. American courts seem first to have expressed skepticism. By the 1970's, however, American courts began to adopt the English common-law rule" (*Apache Nation*, 564 US at 170-171 [citations omitted]).[5]

*Apache Nation* identifies as "[t]he leading American case on the fiduciary exception" (564 US at 171) the Delaware Chancery Court's decision in *Riggs* (355 A2d 709 [Del Ch 1976], *supra*), in which a trustee was compelled to produce to the trust's beneficiaries an attorney's legal memorandum (the Workman memorandum) that had been prepared for the trustee, at the trust's expense, in anticipation of potential tax litigation on behalf of the trust (355 A2d at 710). In rejecting the trustee's

---

5. See also Restatement (Third) of Law Governing Lawyers § 84, Comment *b* (the fiduciary exception prevents a trustee from invoking attorney-client privilege to withhold from trust beneficiaries "evidence of the trustee's communications with a lawyer retained to advise the trustee in carrying out the trustee's fiduciary duties"); Restatement (Third) of Trusts § 82, Comment *f* ("legal consultations and advice obtained in the trustee's fiduciary capacity concerning decisions or actions to be taken in the course of administering the trust . . . are subject to the general principle entitling a beneficiary to information that is reasonably necessary to the prevention or redress of a breach of trust") and Reporter's Note, Comment *f*; 17 Alan Newman, Bogert on Trusts and Trustees § 962 at 66-73 (3d ed 2010); 3 Austin Wakeman Scott et al., Scott & Ascher on Trusts § 17.5 at 1202-1205 (5th ed 2007).

claim of attorney-client privilege with respect to the Workman memorandum, the Delaware court looked to "the purpose for which it was prepared, and the party or parties for whose benefit it was procured" (355 A2d at 711), and found

> "that the Workman memorandum was prepared ultimately for the benefit of the beneficiaries of the trust and *not* for the purpose of the trustees' own defense in any litigation against themselves. . . . [T]he ultimate or *real clients* were the beneficiaries of the trust, and the trustee, Mr. Porter, in his capacity as a fiduciary, was, or at least should have been, acting only on behalf of the beneficiaries in administering the trust. At that stage, there were no proceedings requiring the trustees to seek legal advice personally. As of that time there are in the record no allegations of litigation, or even threats of it, against the trustees. Moreover, there is nothing before the Court to suggest that the purpose of the Workman memorandum was defensive on the trustees' part. Clearly then, the rights of the beneficiaries would have been the foremost consideration in Mr. Porter's consultations and communications with his legal advisers. Moreover, the payment to the law firm out of the trust assets is a significant factor, not only in weighing ultimately whether the beneficiaries ought to have access to the document, but also it is in itself a strong indication of precisely who the real clients were" (355 A2d at 711-712 [additional emphasis added]).[6]

In concluding that the fiduciary exception applied to the memorandum, the *Riggs* court observed:

> "As a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client [of the attorney who prepared the memorandum] in the sense that *he* is personally being served. And, the beneficiaries are not simply incidental beneficiaries who *chance* to gain from

---

**6.** In the latter regard, the court noted: "The distinction has often been drawn between legal advice procured at the trustee's *own* expense and for his *own* protection and the situation where the trust itself is assessed for obtaining opinions of counsel where interests of the beneficiaries are presently at stake" (355 A2d at 712, citing Restatement [Second] of Trusts § 173, Comment *b*).

the professional services rendered. The very intention of the communication is to aid the beneficiaries. . . . The fiduciary obligations owed by the attorney at the time he prepared the memorandum were to the beneficiaries as well as to the trustees. In effect, the beneficiaries were the clients of Mr. Workman as much as the trustees were, and perhaps more so" (355 A2d at 713-714 ).

Thus, under the *Riggs* analysis, whether the fiduciary exception applies depends on whether the "real client" of the attorney from whom the fiduciary sought advice was the beneficiary of the fiduciary relationship or, alternatively, the fiduciary in his or her individual capacity.

In New York, the fiduciary exception was recognized and applied in *Hoopes* (142 AD2d 906 [3d Dept 1988], *affd* 74 NY2d 716 [1989], *supra*), in which a trustee was compelled to disclose the content of his communications with the trust's attorneys concerning certain transactions and proposals involving the trust and the corporation of which it was majority shareholder. Although the *Hoopes* decisions (from the Appellate Division and the Court of Appeals) do not use the term "real client," each of them cites *Riggs*, and the Third Department, in holding the fiduciary exception applicable, observed, among other things, that the trustee had not shown

"any factors which would militate in favor of applying the privilege to the information sought. For example, defendant [the trustee] might have shown that he solicited advice from counsel solely in an individual capacity and at his own expense, as a defensive measure regarding potential litigation over his disputes with the trust beneficiaries" (142 AD2d at 910-911, citing, inter alia, *Riggs*, 355 A2d at 711).

Because no such showing had been made, and the record in fact "suggest[ed] that counsel acted on behalf of defendant both in his role as trustee and as the chief executive officer of the corporation" (142 AD2d at 911), the claim of attorney-client privilege was rejected. In substance, the assertion of the privilege was overruled in *Hoopes* based on a finding that the trust's beneficiaries, not the trustee individually, were the "real clients" of the attorney who had advised the trustee.

■ Because the applicability of the fiduciary exception depends on whether the "real client" of the attorney rendering

counsel was the fiduciary in his or her individual capacity or, on the other hand, the beneficiaries to whom the fiduciary duty was owed, the fiduciary exception does not apply to the attorney-client communications of a fiduciary who seeks legal advice to protect his or her own individual interests, rather than to guide the fiduciary in the performance of his or her duties to the beneficiary. This principle is illustrated by this Court's decision in *Beck v Manufacturers Hanover Trust Co.* (218 AD2d 1 [1st Dept 1995]), in which we wrote:

> "[T]o the extent that plaintiffs seek access to communications and documents concededly falling within the protective ambit of the attorney-client privilege, their disclosure request is without merit. While plaintiffs as trust beneficiaries seek access to the materials under the exception to the privilege articulated in *Hoopes v Carota* (142 AD2d 906, *affd* 74 NY2d 716), that exception is not applicable here. As the record shows, plaintiffs have been in an adversary relation with the Trustee since the late 1970's and the disclosure plaintiffs apparently seek concerns communications not generally relevant to the administration of the trust, but specifically relevant to the handling of the very issues the plaintiffs had been threatening to litigate. It is precisely where, as here, the trustee consults counsel in order to defend itself against the conflicting claims of beneficiaries that the exception delineated in *Hoopes* is inapplicable" (218 AD2d at 17-18, citing *Hoopes*, 142 AD2d at 910-911).[7]

---

7. *See also* Restatement (Third) of Law Governing Lawyers § 84, Comment *b* (the fiduciary exception "does not apply to communications between the trustee and a lawyer specifically retained by the trustee to represent, not the trust or the trustee with respect to executing trust duties, but the trustee in the trustee's personal capacity"); Restatement (Third) of Trusts § 82, Comment *f* ("A trustee is privileged to refrain from disclosing to beneficiaries or co-trustees opinions obtained from, and other communications with, counsel retained for the trustee's personal protection in the course, or in anticipation, of litigation [e.g., for surcharge or removal]"); 3 Austin Wakeman Scott et al., Scott & Ascher on Trusts § 17.5 at 1202-1203 ("But when there is a conflict of interest between the trustee and the beneficiaries and the trustee procures an opinion of counsel for the trustee's own protection, the beneficiaries are generally not entitled to inspect it"); *Consultation with a Law Firm's In-House Counsel on Matters of Professional Ethics Involving One or More Clients of the Law Firm,* NY St Bar Assn Comm on Prof Ethics Op 789 (NYSBA Opinion 789) (Oct. 26, 2005) ¶ 4 n 1 (noting that, under the fiduciary

The parties advise us that no prior reported decision of any New York state court has considered the application of the fiduciary exception in a case where the fiduciaries invoking the attorney-client privilege are lawyers who, during their representation of a client, sought legal advice (whether from their firm's in-house counsel or outside counsel) concerning issues of professional ethics or potential malpractice liabilities arising from the firm's representation of that client. In recent years, however, the courts of a number of other states—including the highest courts of Georgia (*St. Simons Waterfront, LLC v Hunter, Maclean, Exley & Dunn, P.C.*, 293 Ga 419, 427-429, 746 SE2d 98, 107-108 [2013]) and Massachusetts (*RFF Family Partnership, LP v Burns & Levinson, LLP*, 465 Mass 702, 713-716, 991 NE2d 1066, 1074-1076 [2013])—have held that the fiduciary exception to the attorney-client privilege, assuming that the jurisdiction recognizes it, does *not* apply to communications between lawyers and their firm's in-house counsel addressing such concerns arising from the ongoing representation of a firm client (*see also Garvy v Seyfarth Shaw LLP*, 966 NE2d 523, 536, 359 Ill Dec 202, 215 [App Ct 2012] [declining to adopt the fiduciary exception but noting that it would not apply in the case at bar if Illinois recognized it]). These courts have concluded that, when lawyers seek the advice of their firm's in-house counsel concerning possible conflicts, ethical obligations and potential liabilities arising from the representation of a current firm client, the in-house counsel's "real clients" are the lawyers and the firm itself—not the firm client from whose representation the issues arise—and, therefore, evidence of communications seeking or rendering such advice may be withheld from the firm client as privileged.

The American Bar Association (ABA), in a resolution adopted by its House of Delegates in 2013, has taken a position on the operation of the fiduciary exception in the law firm context consistent with the holdings of the Georgia Supreme Court and the Massachusetts Supreme Judicial Court, endorsing the view that

> "the 'fiduciary exception' to the attorney-client privilege . . . , if recognized by the jurisdiction, does not apply to confidential communications between law firm personnel, acting on behalf of the

exception analysis of *Hoopes* and *Beck*, "when a fiduciary seeks legal advice concerning the fiduciary's *own* potentially conflicting obligations, including with respect to potentially different interests of beneficiaries, the fiduciary may assert privileges against the beneficiaries").

law firm in its individual capacity, and the firm's in-house or outside counsel, even if those communications regard the law firm's own duties, obligations, and potential liabilities to a current client" (ABA, House of Delegates Resolution 103 [2013] [ABA Resolution 103]).[8]

The relevant facts of this case—which are not in material dispute—establish that the fiduciary exception does not apply to the January 2011 emails because SHS&L and its attorneys were the "real clients" for purposes of these attorneys' consultation with Kipnes, the firm's in-house general counsel, whose time spent on the consultation was not billed to plaintiff and who never worked on any matter for plaintiff. The three SHS&L attorneys who sought Kipnes's legal advice—Carty, whom plaintiff's adversary in the FINRA arbitration intended to call to testify about her past representation of plaintiff in the negotiation of his separation agreement, and Hecht and Murray, the litigators who were representing plaintiff in the arbitration—had their own reasons, apart from any duty owed to plaintiff, for seeking the legal guidance. MSSB's announced intention to call Carty to testify against plaintiff raised an obvious issue under RPC rule 3.7, the lawyer-as-witness rule. The attorneys, not plaintiff, would be subject to disqualification or professional discipline for any violation of the RPC in their handling of the arbitration. In addition, SHS&L itself had an obligation "to ensure that all lawyers in the firm conform[ed]" to the RPC (RPC rule 5.1 [a]) and thus to have Carty, Hecht and Murray receive appropriate legal counsel about their ethical duties.

The interests of SHS&L and its attorneys in adhering to their ethical obligations did not necessarily coincide with plaintiff's interest in successfully and efficiently prosecuting the arbitration against MSSB. For example, an opinion by SHS&L's in-house counsel that the firm should withdraw from representing plaintiff would have protected the professional

---

**8.** Without specifically referencing the fiduciary exception, the Restatement has taken a similar position:

"A lawyer may refuse to disclose to the client certain law-firm documents reasonably intended only for internal review, such as a memorandum discussing . . . whether a lawyer must withdraw because of the client's misconduct, or the firm's possible malpractice liability to the client. The need for lawyers to be able to set down their thoughts privately in order to assure effective and appropriate representation warrants keeping such documents secret from the client involved" (Restatement [Third] of Law Governing Lawyers § 46, Comment c).

interests of the firm and its attorneys but would not have directly advanced plaintiff's claims in the arbitration or the federal court action. Indeed, the firm's withdrawal from the representation likely would have significantly delayed the resolution of plaintiff's claims and increased the expense of the arbitration. Any benefit to plaintiff from his attorneys' adherence to their ethical obligations as a result of the consultation with the in-house counsel would have been indirect and incidental (*cf. Riggs*, 355 A2d at 713 [ordering disclosure of the trustee's attorney-client communications to the trust beneficiaries, who were "not simply incidental beneficiaries who *chance* to gain from the professional services rendered"]).[9] Thus, because the purpose of the consultation with Kipnes—for whose time, to reiterate, plaintiff was not billed—was to ensure that the attorneys and the firm understood and adhered to their ethical obligations as legal professionals, the attorneys and the firm, not plaintiff, were the "real clients" in this consultation.

We also reject plaintiff's argument that the January 2011 emails are necessarily subject to the fiduciary exception because his relationship with SHS&L had not yet reached the stage of actual hostility as of the time of those communications. The considerations that support sustaining SHS&L's invocation of attorney-client privilege as to these communications are not diminished by the fact that, when the communications took place, neither plaintiff nor SHS&L was threatening to sue the other. The protection afforded by the attorney-client privilege encourages lawyers to seek advice concerning their ethical responsibilities and potential liabilities in a timely manner so as to minimize any damage to the client from any conflict or error. Much of this benefit—to both lawyers and clients—would be lost if the attorney-client privilege could be invoked by a lawyer who sought legal advice to protect his or her own interests only for consultations that took place after the lawyer or the client had openly taken a position adverse to the other.

In rejecting plaintiff's proposed distinction between cases in which relations between lawyer and client have become openly adverse and cases in which they have not, we find illuminating the following discussion by the Massachusetts Supreme Judicial Court:

---

9. Because plaintiff might well incidentally benefit from his attorneys' consultation with their firm's in-house counsel on an ethical issue, the denial in defendants' answer of plaintiff's allegation that the consultations with Kipnes "were adverse to, or to the detriment of, or otherwise 'not for the benefit of Plaintiff'" is consistent with defendants' position that the firm and its attorneys were the "real clients" in that consultation.

"[A]n attorney's or a law firm's duty of loyalty to a client is not always painted in bright lines. It may not always be clear when the interests of the client and the law firm have become so adverse that withdrawal is required in the absence of client waiver, and even when it is clear that withdrawal is necessary, a law firm may need to consider how to minimize the potential adverse consequences of withdrawal to the client, such as where a law firm's withdrawal may imperil a business deal that is near a closing or where a law firm represents the client . . . in multiple legal matters. . . . The in-house counsel whom the law firm has designated to help its attorneys comply with all applicable ethical rules is the logical counsel to turn to for advice as to how the firm may best comply with rule 1.7, especially where time is of the essence. . . . Soliciting . . . advice [concerning a conflict], whether from an in-house counsel at the law firm or from an attorney at another law firm, is not in and of itself adverse to the client, and doing so may ultimately benefit the client. . . . Ultimately, it is usually in the interests both of the attorney seeking advice and of the client that the ethical issues be examined by a competent advisor who has been fully informed of all relevant facts, with none withheld out of fear that the consultation may not remain private" (*RFF Family Partnership*, 465 Mass at 711, 991 NE2d at 1073 [internal quotation marks and brackets omitted]).[10]

---

**10.** *See also TattleTale Alarm Sys., Inc. v Calfee, Halter & Griswold, LLP*, 2011 WL 382627, *5, 2011 US Dist LEXIS 10412, *14-15 (SD Ohio, Feb. 3, 2011, No. 2:10-CV-226):

"[I]ndividual lawyers who come to the realization that they have made some error in pursuing their client's legal matters should be encouraged to seek advice promptly about how to correct the error, and to make full disclosure to the attorney from whom that advice is sought about what was done or not done, so that the advice may stand some chance of allowing the mistake to be rectified before the client is irreparably damaged. If such lawyers believe that these communications will eventually be revealed to the client in the context of a legal malpractice case, they will be much less likely to seek prompt advice from members of the same firm. . . . [T]here aresocietal values to be served by allowing members of a law firm to converse openly and freely about potential mis-steps in their representation of a

In sum, we find that the fiduciary exception simply has no application to the January 2011 emails. Those communications were part of a consultation between three SHS&L attorneys and the firm's in-house counsel to obtain advice about the ethical obligations of the firm and the attorneys, in representing plaintiff in his arbitration against MSSB, in light of the demand by plaintiff's adversary for the testimony of Carty, a member of the firm. The in-house counsel had never worked on any matter for plaintiff, and plaintiff was not charged for the time the in-house counsel devoted to the consultation. While plaintiff, as the firm's client, might well have benefited incidentally from this consultation, SHS&L and the attorneys concerned, not plaintiff, were the in-house counsel's "real clients" in rendering his advice.

Further, even if (as plaintiff speculates) the consultation extended beyond the ethical implications of the demand for Carty's testimony to the question of whether plaintiff had a colorable malpractice claim against the firm based on the earlier transactional representation, this would not change our conclusion that the January 2011 emails do not fall within the fiduciary exception.[11] Indeed, this conclusion would be only reinforced by an assumption that the consultation with SHS&L's in-house counsel extended to consideration of the firm's potential malpractice liability. Needless to say, plaintiff could not have been the "real client" for purposes of internal discussions at SHS&L concerning the firm's potential liability to him (see St. Simons Waterfront, 293 Ga at 428, 746 SE2d at 108 [holding that the fiduciary exception did not apply to a consultation between attorneys and their firm's in-house counsel because "(a)ttorneys within a firm seeking advice to defend against threatened litigation by a current client clearly do not share a mutuality of interest with that client"]).

Because we conclude that the fiduciary exception does not apply to the January 2011 emails, we need not consider whether plaintiff has made a showing of good cause for requiring disclosure of those documents. Where a party seeks to require disclosure of attorney-client communications pursuant

client without worrying about whether the client will eventually be able to use those communications to the lawyer's disadvantage."

**11.** We note that SHS&L represents that the consultation concerned only the ethical issue under the lawyer-as-witness rule presented by the demand for Carty's testimony.

to the fiduciary exception, the question of good cause for disclosure arises only after it has been determined that the party seeking the disclosure was the "real client" entitled to invoke the exception (*see Hoopes v Carota*, 142 AD2d at 910 [directing disclosure pursuant to the fiduciary exception where "(t)he information sought is highly relevant to and may be the only evidence available on whether defendant's actions respecting the relevant transactions and proposals were in furtherance of the interests of the beneficiaries of the trust or primarily for his own interests"]; *see also Beck*, 218 AD2d at 17-18 [denying motion for discovery of attorney-client communications pursuant to the fiduciary exception, on the ground that the exception was not applicable, without reaching the question of good cause]).[12]

---

**12.** Since this appeal was submitted, this Court has decided *NAMA Holdings, LLC v Greenberg Traurig LLP* (133 AD3d 46 [1st Dept 2015]), which deals with the fiduciary exception in the context of a dispute between the managers of a limited liability company (Alliance), in the role of the fiduciary, and a major investor in Alliance, in the role of the beneficiary of the fiduciary duty. The investor brought an action asserting direct and derivative claims against Alliance's managers and the law firm that represented both Alliance and the managers. In response to the investor's discovery demands, the law firm invoked attorney-client privilege to withhold from production more than 3,000 documents generated over several years. In the order appealed from, Supreme Court had directed the law firm to produce all of the documents on the ground that the parties did not have an adversarial relationship during the period in which the documents were generated. This Court reversed, holding that " 'adversity' is not a threshold issue in determining whether the fiduciary exception is applicable in a given case, but one of several factors to consider in making that determination, and that adversity cannot be determined without a review of the purportedly privileged communications" (133 AD3d at 48). *NAMA* plainly presented a far more complex privilege issue than does this appeal, which concerns only two dozen emails generated over a period of nine days as a result of a consultation triggered by a specific event (the demand for Carty's testimony) with a lawyer (Kipnes) who had never represented plaintiff. By contrast, in *NAMA*, the defendant law firm had represented both Alliance and the managers over a period of several years, and the privilege was being asserted as to thousands of documents generated over this period. As this Court recognized, even if the relationship between the managers and the investor was adversarial at the time that a given document had been generated, that document would still be subject to the fiduciary exception if it reflected a consultation concerning the management of Alliance, as opposed to the personal interests of the managers vis-à-vis the investor (*see* 133 AD3d at 58-59). In essence, we ordered an in camera review of the documents at issue in *NAMA* to determine whether the "real client" for which each document was generated was Alliance or, on the other hand, the managers in their individual capacities (*see* 133 AD3d at 53 [recognizing that the purpose of the fiduciary exception is to prevent a fiduciary from hiding legal advice obtained in a fiduciary capacity from the beneficiaries of the fiduciary duty where those beneficiaries were the attorney's " 'real clients' " in the consultation]). In this case, for the reasons we have discussed, SHS&L and its lawyers, not plaintiff, were plainly the "real

Plaintiff argues that, even if the fiduciary exception is found not to apply, he is entitled to disclosure of the January 2011 emails under a doctrine known as the "current client exception," which some courts have recognized (*see e.g. Bank Brussels Lambert v Credit Lyonnais [Suisse]*, 220 F Supp 2d 283 [SD NY 2002], *supra*; *Koen Book Distribs., Inc. v Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.*, 212 FRD 283 [ED Pa 2002]; *In re Sunrise Sec. Litig.*, 130 FRD 560 [ED Pa 1989]; *In re SonicBlue Inc.*, 2008 WL 170562, 2008 Bankr LEXIS 181 [ND Cal, Jan. 18, 2008, Nos. 03-51775, 03-51776, 03-51777, 03-51778-MM]). Applicable specifically to attorneys (as opposed to fiduciaries in general), the current client exception holds that a law firm cannot invoke attorney-client privilege to withhold from a client evidence of any internal communications within the firm relating to the client's representation, including consultations with the firm's in-house counsel, that occurred while the representation was ongoing. Unlike the fiduciary exception, the current client exception apparently bars invocation of the attorney-client privilege regardless of the identity of the "real client" to whom the legal advice in question was rendered.

█ The rationale behind the current client exception appears to be that the law firm's in-house counsel's advice to the other firm attorneys, on a matter as to which the firm's interests and those of a current outside client are not congruent, involves the firm in an impermissible simultaneous representation of conflicting interests, namely, those of the outside client and those of the firm, as the in-house counsel's client. The impermissible conflict, in this view, emerges from the imputation to the in-house counsel, pursuant to RPC rule 1.10 (a), of the firm's representation of that client, at the same time that the in-house counsel is actually representing the firm's interests against the client in the in-house consultation. RPC rule 1.10 (a) provides in pertinent part: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7 . . . , except as otherwise provided therein." RPC rule 1.7 (a) provides, in pertinent part, that, absent each affected client's informed consent given in writing as provided in rule 1.7 (b),

---

clients" in the consultation with Kipnes that generated the handful of emails at issue, and the fiduciary exception therefore does not apply.

"a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

"(1) the representation will involve the lawyer in representing differing interests; or

"(2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests."[13]

Since 2012, a significant body of case law has accumulated in state courts around the country—including the highest courts of Georgia (*St. Simons Waterfront*, 293 Ga 419, 746 SE2d 98 [2013], *supra*), Massachusetts (*RFF Family Partnership*, 465 Mass 702, 991 NE2d 1066 [2013], *supra*), and Oregon (*Crimson Trace Corp. v Davis Wright Tremaine LLP*, 355 Or 476, 326 P3d 1181 [2014])—that unequivocally rejects the current client exception to the attorney-client privilege (*see also Edwards Wildman Palmer LLP v Superior Court*, 231 Cal App 4th 1214, 180 Cal Rptr 3d 620 [2014]; *TattleTale Alarm*, 2011 WL 382627, 2011 US Dist LEXIS 10412 [SD Ohio, Feb. 3, 2011, No. 2:10-CV-226], *supra*). In addition, the ABA, in the aforementioned resolution adopted by its House of Delegates in 2013, urged all federal and state courts to uphold the application of the attorney-client privilege to communications between a firm's attorneys and the firm's in-house counsel on issues arising from the representation of a current client—recommend-

---

**13.** As explained by the Massachusetts Supreme Judicial Court in its decision rejecting the current client exception,

> "the underlying theme [of cases recognizing the exception] seems to be that . . . [when] the attorneys in the firm seek legal advice from the law firm's in-house counsel [concerning an actual or possible conflict with the client] . . . , the law firm [through its in-house counsel] is both the attorney for the outside client and itself a client, and these two 'clients' have conflicting interests"
>
> (*RFF Family Partnership*, 465 Mass at 718, 991 NE2d at 1077).

This is borne out by the decisions recognizing the exception (*see Bank Brussels*, 220 F Supp 2d at 288 [rejecting claim of privilege as to lawyers' consultation with in-house counsel on the ground that "a conflict as to one attorney at a firm is a conflict as to all"]; *Sunrise Sec.*, 130 FRD at 597 ["a law firm's communication with in house counsel is not protected by the attorney client privilege if the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communication"]; *SonicBlue*, 2008 WL 170562, *9, 2008 Bankr LEXIS 181, *26-27 ["a law firm cannot assert the attorney-client privilege against a current outside client when the communications that it seeks to protect arise out of self-representation that creates an impermissible conflicting relationship with that outside client"]).

ing, in effect, that the current client exception be rejected.[14] For the reasons discussed below, we agree with the weight of recent national decisional authority, as well as with ABA Resolution 103, that the current client exception should not be adopted.

Before explaining our reasons for rejecting the current client exception, we observe that we do not believe that a consultation by attorneys with their firm's in-house counsel on a purely ethical issue arising from the representation of a current client—which, according to SHS&L and Carty, was the sole subject of the consultation with Kipnes—inherently gives rise to a conflict of interest between the firm and the client. This precise point is directly addressed in NYSBA Opinion 789. Referring to the close analogue of current RPC rule 1.7 (a) (1) (prohibiting the simultaneous representation of "differing interests") in the former Code of Professional Responsibility (DR 5-105 [former 22 NYCRR 1200.24]), the authors of the opinion framed the question as "whether an in-house ethics advisor represents interests 'differing' from those of clients" (NYSBA Opinion 789 ¶ 14). The question was answered as follows:

> "We think not. The Code defines 'differing interests' to mean 'every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be conflicting, inconsistent, diverse or other interest.' [This definition is now found at RPC rule 1.0 (f).] The key phrase is that the interest must be one that will 'adversely affect *either the judgment or the loyalty of a lawyer to a client.*' Because the Code requires adherence to its rules in service of the many duties a lawyer owes, a law firm's consideration of its own legal and ethical obligations in connection with its representation of one or more clients cannot be said to implicate a

---

**14.** Insofar as addressed to the current client exception, the resolution urged courts to recognize that "any conflict of interest arising out of a law firm's consultation with its in-house counsel regarding the firm's representation of a then-current client and a potentially viable claim the client may have against the firm does not create an exception to the attorney-client privilege" (ABA Resolution 103). The report accompanying the proposal that became ABA Resolution 103 notes that the Restatement (Third) of Law Governing Lawyers, in the comment to section 46 quoted at footnote 8 above, implicitly rejects the current client exception (*see* ABA, Resolutions with Reports to the House of Delegates, 2013 Annual Meeting, Report 103 [ABA Report 103] at 6).

'differing interest' that will adversely affect the lawyer's exercise of professional judgment nor the loyalty due a client within the meaning of the Code.

"To suggest otherwise is counter to everything the Code embodies. The purpose of consultation on a lawyer's ethical and legal obligations is to facilitate the inquirer's adherence to applicable law and rules. Seeking advice from an in-house ethics advisor is intended to facilitate the lawyer's proper exercise of professional judgment and a lawyer's appropriate discharge of the duty of loyalty owed to the client in the same way that an outside client's consultation with a lawyer in the firm is intended to facilitate the client's lawful achievement of legitimate objectives. Considering a lawyer's ethical obligation to represent a client within the bounds of the law, for instance, does not give rise to any rightful claim that such consideration alone adversely affects the lawyer's professional judgment or loyalty, for this is what lawyers are supposed to do" (NYSBA Opinion 789 ¶¶ 15-16 [paragraph numbers and footnotes omitted]).

NYSBA Opinion 789 similarly rejected the view that consulting with a firm's in-house counsel on a client-related ethical matter necessarily posed a problem under former Code of Professional Responsibility DR 5-101 (a) (former 22 NYCRR 1200.20 [a]), the close analogue of current RPC rule 1.7 (a) (2) (prohibiting a representation that raises "a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests"):

"We believe that a lawyer's interest in ensuring compliance with the lawyer's ethical duties or obligations, or considering the effects of a possible violation of those duties, does not generally raise issues under DR 5-101(A). A lawyer's interest in carrying out the ethical obligations imposed by the Code is not an interest extraneous to the representation of the client. It is inherent in that representation and a required part of the work in carrying out the representation. *It is, in other words, not an interest that 'affects' the lawyer's exercise of independent professional judgment, but rather is an*

*inherent part of that judgment*" (NYSBA Opinion 789 ¶ 12 [emphasis added]).[15]

The foregoing analysis of NYSBA Opinion 789 persuades us that no conflict arose solely by virtue of the fact that defendant Carty and the SHS&L attorneys representing plaintiff in the arbitration consulted with the firm's in-house counsel as to their ethical obligations under the attorney-as-witness rule when informed that opposing counsel in the arbitration intended to call Carty as a witness. Since the existence of a conflict between the law firm and its outside client with respect to the subject matter on which the in-house counsel was consulted is the lynchpin of the applicability of the current client exception, that exception, even if we were to adopt it, would not apply to a consultation with the in-house counsel on that purely ethical matter. Still, insofar as the consultation at issue in this case might have extended to whether SHS&L was potentially liable to plaintiff for malpractice, or how the firm should prepare to defend itself against such a claim, the consultation concerned a matter as to which plaintiff's interests and those of the firm unquestionably conflicted. Under that scenario, the current client exception, if we were to adopt it, apparently would apply to the January 2011 emails generated by the consultation. But we find compelling the arguments against the adoption of that rather draconian exception to the attorney-client privilege.[16]

First, even if we were to adopt plaintiff's position that Kipnes would have violated RPC rules 1.10 (a) and 1.7 (a) by advising SHS&L, as its in-house counsel, on a matter involving a conflict of interest between the firm and an outside client (i.e., plaintiff), any such ethical violation would not result in the

---

**15.** The ABA has expressed agreement with the view of NYSBA Opinion 789 that an attorney's consultation with his or her law firm's in-house counsel on a client-related ethical issue does not necessarily involve a conflict of interest between the firm and the client (*see* ABA Comm on Ethics and Prof Responsibility Formal Op 08-453 at 2-3 [Oct. 17, 2008]; *see also* ABA Report 103 at 3-4).

**16.** As previously noted, SHS&L represents that the question of potential malpractice liability was not a subject of the consultation with Kipnes, notwithstanding that the email from opposing counsel demanding Carty's testimony stated that MSSB, in defending itself against plaintiff's claim, would take the position that plaintiff's loss was related to "your firm's [i.e., SHS&L's] failures respecting the contract negotiations." Without questioning SHS&L's representation as to the scope of the consultation with Kipnes, we dispose of the appeal assuming, as plaintiff seemingly asks us to assume at certain points in his brief, that the consultation also covered the malpractice question.

abrogation of an otherwise valid evidentiary privilege attaching to the consultation. The ethical rules governing the legal profession and the law of evidence are two separate and distinct bodies of law. A violation of the former, even if warranting the imposition of professional discipline, does not vitiate a privilege otherwise available under the latter. In this regard, the Preamble to the RPC states:

> "[T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule" (RPC Preamble ¶ 12).[17]

Permitting a former client to invoke a possible ethical violation by his former law firm as grounds for abrogation of the firm's attorney-client privilege, as plaintiff seeks to do here, would be the equivalent of allowing the client to use the RPC as a procedural weapon against his former lawyers. We conclude that this proposed use, one plainly inconsistent with the guidance afforded us by the Preamble to the RPC, is not an intended or proper function of a code of legal ethics. Our view is consistent with the position taken by the highest courts of Georgia, Massachusetts, and Oregon in recent cases presenting factual contexts substantially similar to the one presented here.[18]

---

**17.** The Preamble and Comments to the RPC, although not officially enacted in New York, were promulgated with the ABA Model Rules of Professional Conduct, on which the RPC is based, and may provide persuasive guidance for the interpretation of the RPC.

**18.** *See Crimson Trace*, 355 Or at 501, 326 P3d at 1195 (while "rules of professional conduct [for lawyers] may require or prohibit certain conduct, and the breach of those rules may lead to disciplinary proceedings," this "has no bearing on the interpretation or application of a rule of evidence that clearly applies"); *St. Simons Waterfront*, 293 Ga at 425-426, 746 SE2d at 106 ("the potential existence of an imputed conflict of interest between in-house counsel and the firm client is not a persuasive basis for abrogating the attorney-client privilege between in-house counsel and the firm's attorneys"); *RFF Family Partnership*, 465 Mass at 721, 991 NE2d at 1079 (concluding that the principle that " 'when an attorney [improperly] represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct' " applies "even if th[e] 'client' [invoking the privilege] is a law firm and the 'attorney' is an in-house counsel

More fundamentally, however, we do not believe that SHS&L's in-house counsel, who never personally represented plaintiff on any matter, would have violated his ethical obligations by advising his colleagues within the firm on a matter as to which their interests, and those of the firm, conflicted with plaintiff's interest. The contention that Kipnes's consultation violated the RPC depends upon the construction of the term "a client" in RPC rule 1.10 (a)—the rule providing that any lawyer within a firm "shall [not] knowingly represent *a client* when any one of [the firm's lawyers] practicing alone would be prohibited from doing so" (emphasis added)—to include *the firm itself* when its interests conflict with those of a current outside client. We agree with the view of the Massachusetts Supreme Judicial Court, which, drawing upon a scholarly analysis of the issue (*see* Elizabeth Chambliss, *The Scope of In-Firm Privilege*, 80 Notre Dame L Rev 1721, 1745-1748 [2005] [hereinafter Chambliss]), concluded in *RFF Family Partnership* that the imputation rule of rule 1.10 (a) of the Massachusetts Rules of Professional Conduct (which, like New York's RPC rule 1.10 [a], is based on rule 1.10 [a] of the ABA Model Rules of Professional Conduct) does not bar a law firm's in-house counsel from advising his firm on a matter involving a potential conflict of interest between the firm and a current outside client. The court explained:

> "[I]t is plain that the rule of imputation in rule 1.10(a) . . . generally prohibits attorneys in the same law firm from representing outside clients that are adverse to each other, but there is nothing in the language of or commentary to [rule 1.10 (a)] to suggest that the rule of imputation was meant to prohibit an in-house counsel from providing legal advice to his own law firm in response to a threatened claim by an outside client. Nor does it make

within that same law firm"), quoting *In re Teleglobe Communications Corp.*, 493 F3d 345, 368 (3d Cir 2007); *accord TattleTale Alarm*, 2011 WL 382627, *8, 2011 US Dist LEXIS 10412, *25 (in sustaining a law firm's assertion against its former client of attorney-client privilege as to its communications with its in-house counsel concerning a possible malpractice claim by that client, the court noted the "widely accepted" principle that "the attorney's failure to comply with ethical norms should not deprive the client of the benefit of the attorney-client privilege" [internal quotation marks omitted]); *Garvy*, 966 NE2d at 538, 359 Ill Dec at 217 (in a similar factual context, noting that "while a violation of the [ethical] rules may have relevance to the underlying claims, it has no relevance to the issue of whether the documents in question are protected by the attorney-client privilege").

sense to apply the rule in this context. 'The primary reasons for imputation are to "[give] effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm" and to prevent the misuse of confidential information by lawyers in the same firm.' Chambliss, *supra* at 1747-1748, quoting Rule 1.10 comment 2 of the ABA Model Rules of Professional Conduct (2003). Neither purpose is accomplished by applying the rule of imputation to the representation of a law firm by its in-house counsel.

"The rule of imputation safeguards the duty of loyalty by prohibiting a law firm from representing two clients who are adverse to each other, where loyalty to one client may risk disloyalty to the other client. A law firm can avoid conflicting loyalties by refusing to represent an adverse outside client. But where a law firm is already representing a client and that client threatens to bring a claim against the law firm, the potential conflict between the law firm's loyalty to the client and its loyalty to itself cannot be avoided and must instead be addressed, either by resolving the conflict satisfactorily to the client or withdrawing from the representation. However, a law firm is not disloyal to a client by seeking legal advice to determine how best to address the potential conflict, regardless of whether the legal advice is given by in-house counsel or outside counsel. See Chambliss, *supra* at 1748 (law firm's duty of loyalty 'to the client does not prevent the firm from attempting to defend against client claims,' and 'effort to defend is no more "disloyal" when it involves inside rather than outside counsel'). Applying the rule of imputation in such circumstances therefore would not avoid conflicting loyalties or prevent disloyalty; it would simply prevent or delay a law firm from seeking the expertise and advice of in-house counsel in deciding what to do where there is a potential conflict.

"The rule of imputation also protects the confidentiality of client information by eliminating the risk that information provided by one client will be misused to the advantage of an adverse client. When the adverse client, however, is the law firm

itself, the outside client's information is not protected from the law firm client by imputing the conflict to the in-house counsel because the law firm already possesses the outside client's information, and it has a right to defend itself against the outside client's adversarial claims even to the point of disclosing information given to the law firm in confidence [citing the Massachusetts analogue of New York RPC rule 1.6 (b) (5) (i) and rule 1.6 (b) (5) of the ABA Model Rules of Professional Conduct]. Even if the rule of imputation were to prohibit a law firm's in-house counsel from representing the law firm against an adverse outside client, the law firm would still be entitled to reveal confidential client information to outside counsel where necessary to the law firm's own defense. 'Thus, the imputation of conflicts to firm in-house counsel adds nothing to the protection of the outside client's interests in loyalty or confidentiality.' Chambliss, *supra*" (*RFF Family Partnership*, 465 Mass at 719-721, 991 NE2d at 1078-1079 [footnotes omitted]).[19]

For the reasons set forth in the above-quoted analysis of the issue in *RFF Family Partnership*, we conclude that the consultation between the SHS&L attorneys and the firm's in-house counsel on issues involving a potential conflict of interest between plaintiff and the firm did not violate RPC rule 1.10 (a). Although plaintiff, unlike the client in *RFF Family Partnership*, had not yet threatened to sue his lawyers when the intra-firm consultation at issue took place, we do not believe that this factual distinction should lead to a different result. In arguing for adoption of the current client exception, plaintiff seeks to distinguish *RFF Family Partnership*, as well as *St. Simons Waterfront* and *Edwards Wildman Palmer*, on the ground that intra-firm consultation in those other cases took place

---

**19.** The difference between the relevant language of New York RPC rule 1.6 (b) (5) (i) (permitting disclosure to the extent necessary "to defend the lawyer or the lawyer's employees and associates against an accusation of wrongful conduct") and the relevant language of rule 1.6 (b) (2) of the Massachusetts Rules of Professional Conduct and rule 1.6 (b) (5) of the ABA Model Rules of Professional Conduct (permitting disclosure to the extent necessary "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client") does not, in our view, diminish the validity for New York of *RFF Family Partnership*'s above-quoted analysis.

after the client had threatened to sue the law firm.[20] We reject that suggestion for essentially the same reasons that lead us, as previously discussed, to reject plaintiff's similar argument that the fiduciary exception should apply in this case because the attorney-client relationship had not yet become openly hostile.

We further note that the current client exception, because it is based on the supposed conflict between the in-house counsel's (imputed) duty of loyalty to the outside client and his or her duty of loyalty to the firm as a client, would not apply to a law firm's consultation with a lawyer at another law firm having no relationship with the client. Thus, the current client exception has the effect of penalizing the law firm for seeking advice from one of its own lawyers, even if that lawyer (like Kipnes in this case) has never actually represented or advised the outside client. Requiring a law firm to consult outside counsel would not remove or remedy any potential conflict of interest that created the need for the consultation in the first place. Further, limiting a law firm's ability to invoke attorney-client privilege to consultations with outside counsel would not only increase the cost of obtaining ethical advice, but, more importantly, would likely substantially delay the process of obtaining such advice. We decline to impose a requirement that would result in such a delay and concomitantly increase the potential prejudice to both the client and the law firm, with no compensating benefit to the client (*see RFF Family Partnership*, 465 Mass at 713, 991 NE2d at 1074 [requiring a law firm to retain outside counsel for ethical advice "may delay the receipt of the ethical advice because new counsel will need to be retained and the new counsel's law firm will need to complete its own conflicts check"]; *TattleTale Alarm*, 2011 WL 382627, *5, 2011 US Dist LEXIS 10412, *15 ["by the time a matter has progressed to the point where outside counsel are called in, it may be too late to protect the client from damage"]; NYSBA Opinion 789 ¶ 8 ["To hold that a law firm must always seek guidance outside its halls in order to preserve an attorney-client relationship—that is, to hire outside counsel (whose fiduciary duties may extend only to the firm) in every instance in which such an adversity arises—is simply impractical in the day-to-day

---

**20.** We note that this attempt by plaintiff to distinguish the out-of-state authority rejecting the current client exception is difficult to harmonize with his brief's initial affirmative argument for applying the exception "after [the law firm's] conflict of interest [with the client has] bec[o]me apparent" (internal quotation marks omitted).

life of many law firms, when issues of professional responsibility frequently require prompt responses most usefully provided by lawyers knowledgeable about the firm, its client relationships and its culture"]).

In *RFF Family Partnership*, the Massachusetts Supreme Judicial Court pointed out that the adoption of a rule essentially equivalent to the current client exception—that lawyers should not be permitted to have a privileged consultation with their firm's in-house counsel on a potential conflict with a client "unless the law firm first either withdraws from the representation or fully advises the client about the conflict of interest and obtains the consent of the client to engage in such communications" (465 Mass at 712, 991 NE2d at 1073)—would have "dysfunctional" consequences for "both . . . the client and the law firm" (465 Mass at 713, 991 NE2d at 1074). This is because the adoption of the current client exception would present the lawyer involved with

> "four practical alternatives: first, he could withdraw from the representation without first consulting with better informed [on ethical rules] and more dispassionate in-house ethics counsel; second, he could advise the client of the conflict without first consulting with in-house counsel, and seek the client's consent to confer with in-house counsel; third, he could confer with in-house counsel without first having withdrawn from the representation or obtaining the client's informed consent, recognizing that the communications would not be protected from disclosure to the client; or fourth, he could retain an attorney in another law firm to discuss how best to proceed" (465 Mass at 712, 991 NE2d at 1073-1074).

We agree with the Massachusetts court that "[n]one of these alternatives best serve[s] the interests of the client" (465 Mass at 713, 991 NE2d at 1074). Accordingly, we decline to adopt the current client exception.

In its brief urging us to affirm the order directing SHS&L to disclose the January 2011 emails to plaintiff, amicus curiae the Association of Corporate Counsel (ACC) takes a position even more hostile to a law firm's assertion of attorney-client privilege against a client than that of the decisions adopting the current client exception. The ACC argues that "when an attorney engages in confidential communications regarding a

current client's representation with another attorney, the 'client' for purposes of privilege law is the current client—not his or her lawyer. Thus, the privilege is the right of the client, not his or her lawyer, to assert." The ACC makes clear that it believes that this principle should apply "whether [the lawyer being consulted is] employed by the [inquiring] lawyer's law firm or an outside law firm." Thus, the ACC would have us essentially eliminate the applicability of the attorney-client privilege, as against a lawyer's client, to any consultation by the lawyer relating to his or her work for that client while the representation was ongoing, even if the consultation was with outside counsel, and even if the intended purpose of the consultation was to benefit the lawyer, not the client, as in consideration of whether a malpractice claim might exist. The ACC argues that any other rule "would fly in the face of [a lawyer's] duty to act with undivided loyalty" to a client.

Having rejected the current client exception, we also decline to adopt the even stricter rule urged upon us by the ACC, which apparently has not, to date, been endorsed by any American court. Beyond question, "[l]oyalty and independent judgment are essential aspects of a lawyer's relationship with a client," and "[t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties" (RPC rule 1.7 Comment [1]). The issue here, however, is how lawyers should deal with the dilemma that arises when they realize, in the course of an ongoing representation, that they and the client may have conflicting interests in the matter. In this regard, the ACC overlooks that a law firm's duty of loyalty to its client, as strong as it is, "does not prevent the firm from attempting to defend against client claims" (Chambliss, 80 Notre Dame L Rev at 1748), and that the firm's right to defend itself includes the right to reveal client confidences to the extent reasonably believed necessary "to secure legal advice about compliance with [the RPC] or other law" (RPC rule 1.6 [b] [4]) or "to defend [the firm] . . . against an accusation of wrongful conduct" (RPC rule 1.6 [b] [5] [i]). Accordingly, the end result of adopting the ACC's position would be to "encourag[e] the firm to withdraw at the first hint of a problem," thereby "limit[ing] the firm's opportunity . . . to mitigate harm to the client" (Chambliss, 80 Notre Dame L Rev at 1747 [footnote omitted]; see also RFF Family Partnership, 465 Mass at 712-713, 991 NE2d at 1074 [noting that denial of the

privilege to in-house consultations may prompt a firm to "withdraw without adequately protecting the client's interests"]). As previously discussed, we think it preferable, for both law firms and clients, to afford consultations with a firm's in-house counsel the protection of the attorney-client privilege, even as against the client, so as to "encourage firm members to seek early advice about their duties to clients and to correct mistakes or lapses, if possible, to alleviate harm" (Chambliss, 80 Notre Dame L Rev at 1724).

Plaintiff argues, in support of all his theories for requiring disclosure, that affording the protection of the attorney-client privilege to consultations between lawyers and their firm's in-house counsel, without an exception for the client to whose matter the consultation related, will enable lawyers "to forever shield from their own clients" evidence of the firm's malpractice or other misconduct. This argument fails to persuade us. As noted in one of the decisions upholding a law firm's privilege as to consultations with in-house counsel against a former client:

> "It is simply not the case that a legal malpractice plaintiff will be functionally unable to prove negligence without gaining access to intra-firm communications made during loss prevention efforts. The client still has access to every communication between the client and the firm and to every communication made by the lawyer, whether within the firm or outside of it, that reflects how the lawyer was carrying out the client's legal business. It is hard to conceive of a case where the only evidence of legal malpractice is found within the firm's loss prevention communications" (*TattleTale Alarm*, 2011 WL 382627, *6, 2011 US Dist LEXIS 10412, *15-16).

In this case, defendants are asserting the privilege with respect to only about two dozen email communications that were exchanged over a nine-day period among SHS&L's in-house counsel and the three attorneys in the firm who were then representing plaintiff or had previously represented him. Every other document that SHS&L generated in the course of its representation of plaintiff apparently is available to him in his present lawsuit against the firm. If, as plaintiff claims, SHS&L committed malpractice in representing him in the negotiation of the terms of his departure from his former employer, MasterCard, in 2008, any such malpractice should

be readily provable by means of the documents generated in that representation, the documents (apart from the January 2011 emails) generated in the firm's subsequent representation of plaintiff in the litigation against MasterCard and MSSB, and testimony concerning those representations. In this regard, it should be borne in mind that the attorney-client privilege "applies only to *confidential communications* with counsel (*see*, CLPR 4503), it does not immunize the underlying factual information . . . from disclosure to an adversary" (*Niesig v Team I*, 76 NY2d 363, 372 [1990]). In sum, without expressing any view on the strength of plaintiff's claims in this action, we do not believe that affording the protection of the attorney-client privilege to the two dozen January 2011 emails will substantially impair his ability to prosecute those claims.[21]

Finally, we find that Supreme Court's reliance on three additional grounds for ordering disclosure of the January 2011 emails was erroneous. Supreme Court concluded that the communications between Kipnes, the in-house counsel, and the other SHS&L attorneys relating to plaintiff's representation had not been confidential based on certain deposition testimony by Carty. The court interpreted Carty's testimony to indicate that she had not subjectively expected her communications with Kipnes to be held confidential from plaintiff. Even if this is a correct reading of Carty's testimony, it is undisputed that the communications between Kipnes and the other SHS&L attorneys were never actually disclosed to plaintiff, and "a client's mere intent to disclose to third persons the substance of the discussion held with the attorney does not mitigate the privilege. There must be actual disclosure, otherwise the

---

**21.** Referring to his cause of action under Judiciary Law § 487, plaintiff also contends that disclosure of the January 2011 emails should be required under the crime-fraud exception to the attorney-client privilege, an argument that Supreme Court did not address in granting plaintiff's motion to compel. Plaintiff has not made the showing required to trigger application of the crime-fraud exception (*see Matter of New York City Asbestos Litig.*, 109 AD3d 7, 10-11 [1st Dept 2013] ["A party seeking to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime" (internal quotation marks omitted)], *lv dismissed* 22 NY3d 1016 [2013]). While the record provides grounds for concluding that SHS&L had a conflict of interest in continuing to represent plaintiff after his adversary in the arbitration announced that it would call Carty as a witness, this does not amount to a showing of probable cause to believe that SHS&L was committing a fraud or a crime or that the communications between SHS&L's in-house counsel and the other firm attorneys were in furtherance of any such fraud or crime.

confidence . . . has not been breached" (*Matter of Vanderbilt [Rosner—Hickey]*, 57 NY2d 66, 77 [1982]).[22] Contrary to Supreme Court's view, defendants have not waived their privilege as to the January 2011 emails by placing them at issue; defendants have never indicated, and expressly deny having, any intention to use the privileged documents to prove any claim or defense in this action, such use of privileged materials being the sine qua non of "at issue" waiver (*see Deutsche Bank Trust Co. of Ams. v Tri-Links Inv. Trust*, 43 AD3d 56, 64 [1st Dept 2007]). Neither does the record support Supreme Court's finding that defendants waived their privilege as to the January 2011 emails by selectively disclosing privileged communications in this action.

Accordingly, the order of Supreme Court, New York County (Melvin L. Schweitzer, J.), entered December 8, 2014, which granted plaintiff's motion to compel defendants to produce certain documents that had been withheld on the basis of attorney-client privilege, should be reversed, on the law, with costs, and the motion denied.

MAZZARELLI, J.P., RICHTER, MANZANET-DANIELS and GISCHE, JJ., concur.

Order, Supreme Court, New York County, entered December 8, 2014, reversed, on the law, with costs, and the motion denied.

---

**22.** Plaintiff argues that the circulation of the January 2011 emails to Murray breached the privilege because Murray prepared plaintiff for his testimony in the arbitration. This argument overlooks the fact that Murray, as one of the SHS&L attorneys representing plaintiff in the arbitration, had reason to be made aware of Kipnes's advice about the firm's ethical obligations under the lawyer-as-witness rule in light of opposing counsel's announced intention to call Carty, another SHS&L attorney, to testify in the arbitration.